## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Name of Petitioner

RICHARD SCRIVER,

CIVIL CASE NO. **02 - 60324**

**CIV - DIMITROULEAS**

[CRIM. NO. 00-6215-CR-WPD]

MAGISTRATE JUDGE
JOHNSON

F.I.N. 55313-004,

Place of Confinement:

F.C.C.-Coleman Low

Name of Respondent:

United States of America,
Criminal Case Style:

United States of America, v.
Richard Scriver.



## MOTION TO VACATE, SET ASIDE, OR REDUCE SENTENCE PURSUANT TO TITLE 28 U.S.C. § 2255 BY A PERSON IN FEDERAL CUSTODY, AND REQUEST FOR EVIDENTIARY HEARING WITH INCORPORATED MEMORANDUM OF LAW

THE PETITIONER/DEFENDANT, RICHARD SCRIVER (hereinafter "SCRIVER" or

"Petitioner"), by and through undersigned counsel, moves this Honorable Court to enter

a Writ pursuant to 28 U.S.C. § 2255 vacating, setting aside, or reducing his sentence

based upon ineffective assistance of trial counsel, this Court's lack of jurisdiction to

sentence the Petitioner, and numerous *Apprendi* related errors. In support thereof, the

Petitioner states:

1.  Name and location of court which entered the judgment of conviction:

    United States District Court, Southern District of Florida.

2.  Date of judgment of conviction:

    March 8, 2001.

1

3.    Length of sentence:

36 months incarceration as to Counts I and II of the Superseding Indictment, each running concurrently. In addition, 36 months supervised release as to Counts I and II, with each running concurrently with each other. A fine of $2,000 together with a $200 assessment was also imposed. (DE-108).

4.    Nature of offense involved (all counts):

On August 8, 2000, Mr. Scriver was charged by Information with one count charging a violation of Title 21 U.S.C. § 846 - to-wit: conspiracy to possess with intent to distribute a detectable amount of methlylendioxymethamphetamine (MDMA) from May 15, 2000 through on or about May 20, 2000. (DE-21).

On September 7, 2000, RICHARD SCRIVER, was charged in a two (2) Count "Superseding Indictment" with the following offenses: Count I charged conspiracy to possess with intent to distribute a detectable amount of methlylendioxymethamphetamine (MDMA) from May 15, 2000 through on or about May 20, 2000, in violation of Title 21, U.S.C. § 846, and Count II charged possession with intent to distributed a detectable amount of methlylendioxymethamphetamine (MDMA), on May 19, 2000, in violation of 21 U.S.C. § 841(a)(1) and 2. (DE-29).

On November 2, 2000, another Superseding Indictment was filed in which the only alternations in the charges against RICHARD SCRIVER, was the illegal substance. Specifically, Count I charged conspiracy to possess with intent to distribute "a detectable amount of 3,4-methylenedoxyamphetamine (MDA)" from

2

May 15, 2000 through on or about May 20, 2000, in violation of Title 21, U.S.C. §

846, and Count II likewise charged possession with intent to distribute "a detectable

amount of 3,4-methylenedoxyamphetamine (MDA)" on May 19, 2000, in violation

of 21 U.S.C. § 841(a)(1) and 2. (DE-48).

5.   What was your plea:

  Not guilty.

If you entered a guilty plea to one count or indictment, and not a guilty plea to

another count or indictment, give details:   Not applicable.

6.   If you plead not guilty, what kind of trial did you have?   Jury trial.

7.   Did you testify at trial?   Yes.

8.   Did you appeal from the judgment of conviction?   No.

9.   If you did appeal, answer the following:

  (a)   Name of court:   Not applicable.

  (b)   Result:   Not applicable.

  (c)   Date of result:   Not applicable.

10.   Other than a direct appeal from the judgment of conviction and sentence, have you

previously filed any petition applications or motions with respect to this judgment

in federal court?

  No.

11.   If your answer to 10 was "yes," give the following information:

  (a)   (1)   Name of court:   Not Applicable.

      (2)   Nature of proceeding:   Not Applicable.

(3)   Grounds raised:      Not Applicable.

(4)   Did you receive an evidentiary hearing on your petition, application or motion?      Not applicable.

(5)   Result:      Not applicable.

(6)   Date of result:      Not applicable.

(b)   As to any second petition, application or motion, give the same information:

(1)   Name of court:      Not applicable.

(2)   Nature of proceeding:      Not applicable.

(3)   Grounds raised:      Not applicable.

(4)   Did you receive an evidentiary hearing on your petition, application or motion?      Not applicable.

(5)   Result:      Not applicable.

(6)   Date of result:      Not applicable.

(c)   Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any application or motion?

(1)   First petition, etc.   Not applicable.

(2)   Second petition, etc.      Not applicable.

(d)   If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:      Not applicable.

**12.**   State *concisely* every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States.   Summarize briefly the

4

facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

**A.**   Ground one:

The Petitioner was denied due process and effective assistance of counsel where the evidence at trial did not support a verdict or sentence for conspiracy to possess with intent to distribute MDA or possession with intent to distribute MDA, where the evidence showed that the substance the Petitioner "intended" to possess and/or distribute or conspire to possess and/or distribute was MDMA.

In addition, trial counsel was ineffective in failing to raise this issue at sentencing, resulting in an additional year of incarceration. *See* Petitioner's PSI Objections, attached hereto as ***Exhibit "A."*** Further, initial counsel was ineffective in revealing that independent defense tests showed that the controlled substance seized was MDA rather than MDMA.

Supporting FACTS (state *briefly* without citing cases or law):

Before the DEA lab tested the substance seized upon arrest, all the evidence directed that the illegal substance that was intended to be possessed and/or distributed was MDMA. (See excerpts of testimony of lead agent, Nancy Cook, at pp. 57, 58, 61 and 62, attached as ***Exhibit "B."***).

Additionally, consistent with the expressed intent of the participants, "co-defendant" James Beeson, who was separately charged in District Court Case No. 00-Cr-6158, was only indicted and sentenced for possession of

MDMA; not MDA. (See, excerpts of Beeson file in **Composite Exhibit "C"** - Criminal Complaint, Indictment, and PSI Objections, Judgment and Commitment).

In particular, a comparison of the objections of the Petitioner to co-defendant Beeson reflects that the appropriate base offense level for MDMA would have been level 22 rather than level 26.[1] *Compare* Petitioner's PSI Objections at p. 18 to Beeson's PSI Objections at p. 3, ¶ E.   Petitioner's indictment, PSI Objections and Judgment and Commitment are attached as **Composite Exhibit "D."**

In fact, the Government's lab tests clearly reflected that the substance seized was MDMA, not MDA. See Beeson's objections at p. 3, ¶ E.   The Government only learned that the substance was MDA after defense counsel "shared" information that was thereafter related to the Government that independent tests showed that the substance was MDA as opposed to MDMA.

As a result, the above errors resulted in an four level increase of the Petitioner's Guideline Sentencing range from Level 16 (21-27 mos.) to a Level 20 (33-41 mos.). Accordingly, the trial court sentenced the Petitioner in the middle of the Guideline Range to 36 months incarceration.   Thus, based upon the trial court's sentence in the middle of the Guideline Range,

---

[1] The Drug Equivalency Tables of U.S.S.G. § 2D1.1provide that one gram of "3,4 MDA" is equivalent to 50 grams of marijuana, whereas one gram of "3,4 MDMA" is equivalent to only 35 grams of marijuana.



it is respectfully submitted that the appropriate sentence is 24 months incarceration.

**B.**    Ground two:

The Petitioner was further denied effective assistance of counsel at sentencing by counsel's failure to raise relevant objections pursuant to ***Apprendi v. New Jersey,*** 530 U.S. 466 (2000) and ***Jones v. United States,*** 526 U.S. 277 (1999).

Supporting FACTS (state *briefly* without citing cases or law):

The indictment upon which the Petitioner was tried, did not set for any specific quantity of any illegal substance.  The indictment only placed the Petitioner on "notice" that a "detectable amount" is the quantity that the Grand Jury found.  Likewise, the jury verdict herein failed to require the petit jury to find that the Petitioner conspired to possess with intent to distribute or possessed with intent to distribute any specific quantity of the illegal substance.   Rather, the petit jury only found the Petitioner "guilty as charged" of the "detectable amount" of the illegal substance.  See, DE-79.

Accordingly, as argued further infra, the above demonstrates a clear ***Apprendi*** and/or ***Jones*** error, and, consequently, trial counsel's failure to lodge such objection at sentencing is ineffective assistance of counsel.

**C.**    Ground three:

The Petitioner was illegally convicted in violation of the Presentment and Due Process Clauses of the Fifth Amendment to the U.S. Constitution.

Supporting FACTS (state *briefly* without citing cases or law):

The indictment failed to allege essential elements of Counts I and II, to wit: the quantity of MDA the Petitioner conspired to possess with intent to distribute and possessed with intent to distribute.

**D.**    Ground four:

Petitioner's conviction obtained in violation of the jury trial clause of the Sixth Amendment to the U.S. Constitution.

Supporting FACTS (state *briefly* without citing cases or law):

The petit jury was not instructed to and did not find: (1) the quantity of MDA.

**E.**    Ground five:

Petitioner's sentence was imposed in violation of the Due Process Clause of the Fifth Amendment.

Supporting FACTS (state *briefly* without citing cases or law):

The Sentencing Court usurped the jury's function in determining elements of the offenses and used the wrong standard of proof.

**F.**    Ground six:

The movant was denied effective assistance of counsel, because despite the Petitioner's specific requests, trial counsel failed to raise and argue in a motion to suppress the following issues:

(A)    The Petitioner was arrested without probable cause to believe that he engaged in any offense, and

8

(B)    The Petitioner was not afforded a Consular Notice or Contact or *Mirandized* before being subjected to custodial questioning.

(C)    The Petitioner was not afforded effective counsel since counsel did not aggressively cross-examine witnesses as requested by Petitioner during the suppression motion and during trial.

(D)    The Petitioner's counsel breached his attorney-client privilege by transmitting confidential information to an informing co-Defendant's counsel.

(E)    The Petitioner was deprived of significant direct appeal rights by trial counsel's inaccurate advice and information leading to an unknowing and/or involuntary waiver of direct appeal.

(F)    The Petitioner was denied an effective defense by the introduction of an insufficient and improbable defense case.

Supporting FACTS (state *briefly* without citing cases or law):

At the time the agents stopped the Petitioner's vehicle at gun point, the Government agents had no evidence showing that the Petitioner had discussed the sale and purchase of Ecstasy.   Rather, only after the Agents stopped, arrested and interrogated the Petitioner without affording him access to counsel or proper Consular or Miranda warnings, did the Agents obtain incriminating statements from the Petitioner implicating him in the offenses charged.

9

Additionally, after retaining trial counsel, the Petitioner advised Ms. Baker that he was not provided with any Consular or Miranda warnings at any time, and certainly not before custodial questioning commenced. Additionally, the Petitioner specifically requested that trial counsel include the lack of said warnings in his motion to suppress evidence and statements. However, trial counsel adamantly refused in include those issues, reasoning that such issues would result in a loss of the Petitioner's credibility before the trial court. See also, Affidavit of Arthur Barron, attached hereto as ***Exhibit "E."*** Such reasoning, however, is not a sound "tactical" decision, because such would assume that the trial court was biased against defendants who assert their Fourth Amendment rights when they raise an entrapment defense at trial.

Furthermore, although the Petitioner repeatedly requested an aggressive cross-examination as to the <u>Miranda</u> right waiver, trial counsel refused to do so on the ostensible grounds of not wishing to upset the judge and/or prosecutor.  Also, prior to trial, the petitioner's rights were significantly prejudiced by the revelation of privileged information to co-operating Co-Defendant's counsel by his prior counsel (Hecker) and Petitioner" rights were compromised by a critical collusive agreement/misunderstanding between prior counsel (Marchetta) and government agents, none of which were inquired into by his trial counsel.

10

The result of these actions by trial counsel produced an entirely ineffective defense case.

Lastly the waiver of appeal by Petitioner was the result of incorrect advice and was executed in an involuntary and unknowing manner due to incomplete counsel disclosure as to issues for appeal and due to a known psychological disorder.

13.    If any of the grounds listed in 12 A through F were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them:

The grounds set forth in items 12A through 12F were not previously raised, because Eleventh Circuit law requires all ineffective assistance of counsel claims to be raised in instant habeas proceeding where additional exhibits or testimony must be considered, or where trial counsel was ineffective in failing to raise *Apprendi* or *Jones* issues. *See, United States v. Perulena,* Eleventh Cir. Case No. 00-14256-D, Unpublished Opinion entered October 11, 2001.

Additionally, Apprendi errors are jurisdictional errors that may be raised at any time, and will satisfy a plain error analysis.  The United States Supreme Court's acceptance of certiorari review of the Fourth Circuit's holding in **United States v. Cotton**[2] which held that an **Apprendi** error is jurisdictional in nature, the undersigned submits that the Supreme Court's disposition of **Cotton** will directly

_____

[2] 261 F.3d 397 (4th Cir.), *cert. granted,* 2002 WL 10623, 70 USLW 3348 (U.S. Jan. 4, 2002)(No. 01-687).

effect the validity of ***McCoy*** and the retroactivity of the ***Apprendi*** decision to the case at bar.

**14.**    Do you have any petition or appeal now pending in any court as to the judgment under attack?        No.

**15.**    Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a)    At preliminary hearing:    Arthur Elliot Marchetta, Jr.

915 Middle River Drive, Suite 401

Fort Lauderdale, Florida 33304

and    Howard Scott Hecker, Esq.,

517 S.W. 1st Avenue, Fort Lauderdale,  Florida 33301.

(b)    At arraignment and plea:    Same as above.

(c)    At trial:    David Tucker, Esq.

2600 S. Douglas Road, Suite 1108

Coral Gables, Florida 33134

and    Jeanne Baker, Esq.

2937 S.W. 27th Avenue, Suite 202

Miami, Florida 33133

(d)    At sentencing:    David Tucker, Esq., Jeanne Baker, Esq. and Neil Schuster, Esq. (407 Lincoln Road, Suite 11-B, Miami Beach, Florida 33139).

(e)   In any post-conviction proceeding:                    Not applicable.

(f)   On appeal from any adverse ruling in a post conviction proceeding:

Not applicable.

**16.**   Were you sentenced on more than one count of an indictment, or on more than one

indictment, in the same court and at approximately the same time?  Yes.

**17.**   Do you have any future sentence to serve after you complete the sentence imposed

by the judgment under attack?    No.


## MEMORANDUM OF LAW

The Petitioner is entitled to relief pursuant to Section 2255 based upon ineffective

assistance of trial and sentencing counsel, and further relief pursuant to the Supreme

Court's decisions in *Apprendi vs. New Jersey,* 530 U.S. 466 (2000), *Castillo v. United

States,* 120 S.Ct. 2090 (2000), and *Jones v. United States,* 526 U.S. 227(1999), based

on the failure of the indictment to set forth a quantity of illegal drugs.   Point One of the

incorporated memorandum of law below addresses the ineffective assistance of counsel

arguments raised in Grounds One, Two and Six; Point Two summarizes the Supreme

Court's decisions in the three opinions; and Point Three addresses the retroactivity of said

decisions pursuant to *Teague v. Lane,* 489 U.S. 288 (1989).

## POINT I

The right of an accused to counsel is beyond question a fundamental right. *See e.g.*

*Kimmelman v. Morrison,* 477 U.S. 365 at 377 (1986); *Gideon v. Wainwright,* 372

U.S. 335, 344 (1963).  "Without counsel the right to a fair trial itself would be of little

consequence for it is through counsel that the accused secures his other rights."

***Kimmelman,*** *supra.* "The constitutional guarantee of counsel, however, cannot be

satisfied by the mere retention or appointment of an attorney." *Id.* "An accused is entitled

to be assisted by an attorney whether retained or appointed, who plays the role necessary

to ensure that the trial is fair." ***Strickland v. Washington,*** 466 U.S. 668, 685 (1984).

In other words, the right to counsel is the right to effective assistance of counsel. *E.g.,*

***Strickland,*** 466 U.S. at 686.

Further, the guarantee of effective assistance of counsel under the Sixth

Amendment comprises two correlative rights:  the right to counsel of reasonable

competence, and the right to counsel's undivided loyalty. ***McMann v. Richardson,*** 397

U.S. 759, 770-71 (1970) and ***Wood v. Georgia,*** 450 U.S. 261, 271 (1981).

***Strickland*** established a two-pronged test for determining whether a defendant

has received ineffective assistance of counsel.  Under the first prong, the court must

determine whether counsel's performance was inside "the wide range of professionally

competent assistance," so as "to make the adversarial testing process work in the particular

case." ***Strickland,*** 466 U.S. at 690.

Under the second prong of the test, the court must determine whether the deficient

performance of counsel actually prejudiced the defendant's case.  To satisfy the prejudice

prong of the test, "[t]he defendant must show that there is a reasonable probability, that,

but for counsel's unprofessional errors, the result of the proceeding would have been

different.  A reasonable probability is a "probability sufficient to undermine confidence in

the outcome." ***Strickland,*** 466 U.S. at 694.  "The result of a proceeding can be rendered

unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland,* 466 U.S. at 694.

The Supreme Court has recognized that a single, serious error of counsel may violate a defendant's constitutional right to effective assistance of counsel. ***United States v. Cronic,*** 466 U.S. 648, 657, n. 20 (1984). *See also **Murray v. Carrier,*** 477 U.S. 478, 496 (1986).   A criminal defendant must have "the guiding hand of counsel at every step in the proceedings against him," ***Powell v. Alabama,*** 287 U.S. 45, 69 (1932) – in conducting the investigation necessary for a fair trial,[3] in attempting to persuade the prosecutor to resolve the prosecution without trial,[4] in subjecting the prosecution's case to "the crucible of meaningful adversarial testing,"[5] in determining whether the defendant should take the stand in his or her own defense,[6] in preparing and presenting the defendant's testimony if s/he does,  [7] in evaluating and presenting other defensive evidence,[8] and in arguing to the trier of fact that the prosecution's case is not all that it appears to be or that there is another side to the case warranting a reasonable doubt.[9]

These are the indispensable components of effective advocacy, and "the essential aim

---

[3] ***Kimmelman v. Morrison,*** 477 U.S. 365, 384-385 (1986).

[4] ***Holloway v. Arkansas,*** 435 U.S. 475, 490-491 (1978).

[5] ***United States v. Cronic,*** 466 U.S. 648, 656 (1984).

[6] ***Brooks v. Tennessee,*** 406 U.S. 605, 612-613 (1972).

[7] ***Ferguson v. Georgia,*** 365 U.S. 570 (1961); ***Geders v. United States,*** 425 U.S. 80 (1976).

[8] [Terry] ***Williams v. Taylor,*** 529 U.S. 362 (2000).

[9] ***Herring v. New York,*** 422 U.S. 853 (1975).

of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant." ***Wheat v. United States,*** 486 U.S. 153, 159 (1988).

In addition, "the Supreme Court has held that convicted defendants have a due process right to be sentenced on the basis of accurate information." ***United States ex rel. Welch v. Lane,*** 738 F.2d 863, 864 (7th Cir.1984), *citing **United States v. Tucker,*** 404 U.S. 443, 447, 92 S.Ct. 589, 592, 30 L.Ed.2d 592 (1972), and ***Townsend v. Burke,*** 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948).

In ***Tucker,*** the defendant had been sentenced in part on the basis of a prior conviction which was later found to be unconstitutional because the defendant had not been represented by counsel. The Supreme Court affirmed the court of appeals decision vacating the sentence:

> For we deal here, not with a sentence imposed in the informed discretion of a trial judge, but with a sentence founded at least in part upon misinformation of constitutional magnitude. As in ***Townsend v. Burke,*** 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690, 'this prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue.'
> *Id.* at 741, 68 S.Ct. at 1255.

***Tucker,*** 404 U.S. at 447, 92 S.Ct. at 591-92.

Under ***Tucker,*** "a sentence must be set aside where the defendant can show that false information was part of the basis for the sentence. The two elements of that showing are, first, that information before the sentencing court was inaccurate, and second, that the sentencing court relied on the misinformation in passing sentence." ***Lane,*** 738 F.2d

at 865. *See also, **Townsend v. Burke,*** 334 U.S. 736 (1948); U.S. v. Plain, 856 F.2d 913, 916 (7th Cir. 1988); ***United States v. Roper,*** 716 F.2d 611, 615 (4th Cir.1983).

### *Discussion*

As set forth herein, the error of trial counsel was the failure to lodge an objection to the offense level assessed based on MDA rather than MDMA. That error significantly prejudiced the Petitioner, as it caused this Court to impose a sentence 12 months longer than required for MDMA - - the illegal substance the evidence showed that the Petitioner intended to possess and/or distribute, or conspire to do so.[10]

Before the DEA lab tested the substance seized upon arrest, all the evidence directed that the illegal substance that was intended to be possessed and/or distributed was MDMA. (See excerpts of testimony of lead agent, Nancy Cook, at pp. 57-58 and 61-62, attached as ***Exhibit "B."***).

Additionally, consistent with the expressed intent of the participants, "co-defendant" James Beeson, who was separately charged in District Court Case No. 00-Cr-6158, was only indicted and sentenced for possession of MDMA; not MDA. (See, following excerpts of Beeson file in ***Composite Exhibit "C"*** - Criminal Complaint, Indictment, and PSI Objections, Judgment and Commitment).

In particular, a comparison of the objections of the Petitioner to co-defendant Beeson reflects that the appropriate base offense level for MDMA would have been level 22 rather than level 26. *Compare* Petitioner's PSI Objections at p. 18 to Beeson's PSI Objections at p. 3, ¶ E.

_____

In *U. S. v. Fenandez-Guzman*, 577 F.2d 1093 (7th Cir., Illinois 1978), the court found that, "If postarrest review results in finding of no probable cause to make warrantless arrest, government detention must end regardless of whether arrest was actually valid, but question of suppression of any evidence seized incident to arrest remains dependent, for constitutional purposes, on whether probable cause existed at time of arrest." U.S.C.A. Const. Amend. 4. In *U.S. v. Butts*, 704 F.2d 701 (3d Cir. Pa 1983), the Court held that, "Mere presence of defendant in parked car, which was approached by his codefendants who had been observed applying for the kind of photographic identification necessary to cash stolen checks, did not constitute probable cause to arrest defendant, and the confession obtained from him at postal inspection office thus should have been excluded as fruit of a poisonous tree, since defendant confessed fewer than four hours after he was brought to the office, and since the Government nowhere suggested that any meaningful event occurred within those few hours which could have purged the taint of the illegal arrest." 18 U.S.C.A. § 1708. In *U.S. v. Everroad*, 704 F.2d 403 (8th Cir. 1983), the Court held that, "Agents who knew that person who negotiated drug sale was at a particular residence on the morning of sale, who saw a blue sports car parked at the residence for a while that morning, who later observed defendant, whom they did not know, driving with the negotiator in the area where the sale was to take place, who then saw defendant and the negotiator at a motel where their automobile was parked next to the blue sports car, who saw them enter the motel, who later met the negotiator who said that he would deliver a portion of the drugs then and the rest within one-half hour, and who knew that defendant had remained at the motel, which was less than a one-half hour drive from the



location of the sale, did not have probable cause to arrest defendant, and that, "Existence of exigent circumstances, such as the possibility that a suspect may flee or destroy evidence, may permit law enforcement officials to make a warrantless arrest; such a warrantless arrest must be supported by probable cause that the suspect had committed or was committing a crime."

In fact, the Government's lab tests clearly reflected that the substance seized was MDMA, not MDA. See Beeson's objections at p. 3, ¶ E. The Government only learned that the substance was MDA after defense counsel, Scott Hecker, Esq., "shared" information that was thereafter related to the Government that independent tests showed that the substance was MDA as opposed to MDMA.

As a result, the above errors resulted in an four level increase of the Petitioner's Guideline Sentencing range from Level 16 (21-27 mos.) to a Level 20 (33-41 mos.). Accordingly, the trial court sentenced the Petitioner in the middle of the Guideline Range to 36 months incarceration. Thus, based upon the trial court's sentence in the middle of the Guideline Range, it is respectfully submitted that the appropriate sentence is 24 months incarceration.

Consequently, it is clear that counsel's representation at sentencing denied the Petitioner of his fundamental right to effective assistance of counsel. *e.g.* ***Kimmelman v. Morrison,*** 477 U.S. 365 at 377 (1986); ***Gideon v. Wainwright,*** 372 U.S. 335, 344 (1963).

Likewise, counsel's failure to raise issues in a motion to suppress[11] is the type of

error that results in a loss of his fundamental right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution, his fundamental right to a fair trial, and Sixth Amendment rights to effective assistance of counsel. Here, trial counsel failed to assert that the arresting officers did not have probable cause to arrest SCRIVER when they stopped his vehicle with guns drawn and placed him under arrest. See, Cook-Cross at p. 8

Further, counsel failed to raise in a motion to suppress the arresting agents' failure to *Mirandize* him, advise him of his Consular warning, or notify the Canadian Consulate of his arrest. See, motion to suppress, and Suppression Transcripts at p. 27 where Cook acknowledges no *Miranda* warning was read on May 22, 2000, but see p. 51 (only "believed" *Mirandized*). See also, Affidavit of Arthur Barron, attached hereto as ***Exhibit "E."***

**In U.S. v. Wiseman.** 158 F.Supp.2d 1242 (D. Kan. 2001). "In considering whether the confession or statement is one of free will, the courts look to several factors. including: (1) the characteristics of the defendant, including his age. Education, intelligence, and physical and emotional attributes: (2) the circumstances surrounding the statement, including the length of detention and questioning and the location of questioning: and (3) the tactics, if any, employed by officers, and that, "To determine voluntariness of a statement, the Court must determine whether the confession is the product of an essentially free and unconstrained choice by its maker: if the defendant has willed to confess. his statement may be used against him, but if his will has been overborne and his capacity for self-determination critically impaired the use of his confession offends due

process." U.S.C.A. Const. Amend 5.  In *U.S. v. Gilmer*, 793 F.Supp. '1545 (D.Col. 1992).

"Statements made in response to custodial interrogation are inadmissible as evidence of guilt unless defendant is informed of *Miranda* rights" and that, "Once a defendant has pointed to some evidence that his statements were made in violation of his *Miranda* rights, the government bears burden of proving that defendant voluntarily waived constitutional privilege against self- incrimination and his constitutional right to counsel." U.S.C.A. Const. Amends. 5. 6. In *U.S. v. Gilmer,* 793 F. Supp. 1545 (D.Col. 1992) the Court held that the Government failed to establish that officers fully advised defendant to his *Miranda* rights and consequences of waiver as required to prove voluntariness of waivers despite conclusory statements to effect that defendant was 'Mirandized.'  There was no evidence that officer who allegedly advised defendant of his rights knew what warnings were required under *Miranda* or that he properly advised defendant of his *Miranda* rights and agent was unable to recall what was said or to supply *Miranda* warnings. U.S.C.A. Const. Amends. 5. 6.

Such errors caused significant prejudice in the Petitioner's right to a fair trial, and, accordingly require the reversal of his convictions herein.

Section A.    FAILURE TO INQUIRE AS TO MIRANDA RIGHTS COMPREHENSION
              CONSTITUTES INEFFECTIVENESS OF COUNSEL AT BOTH THE
              SUPPRESION HEARING AND/OR JURY TRIAL


A.    It is submitted that the failure of trial counsel to pursue the absence of <u>Miranda</u> rights warning prior to giving incriminating statements to government agents

constituted prima logic ineffective assistance of counsel. Furthermore, the

representation to Petitioner by trial counsel that this tactic was pursued so as to not

"upset" the trial judge (see affidavits of Arthur Barron (Ex.E) and Petitioner (Ex.F) is, at best,

a questionable (if not an inexplicably improper) tactic. The trial counsel advised the

Petitioner that this tactic would cause the trial judge to believe the Petitioner had lost

credibility which clearly caused the Petitioner to lose a critical constitutional argument

due to trial counsel's wish to "placate the trial judge." The consequence of this tactic is

to virtually capitulate for sentencing purposes, on non-guideline related issues, and

forego a constitutional position based upon infirm and ineffective counsel's decisions.

It should be noted from the onset that trial counsel personally notified the

Petitioner that the <u>Miranda</u> rights inquiry, i.e. cross-examination, would not be pursued

because there was an expressed desire on trial counsel's part to not "upset the judge."

(see Affidavit of Petitioner, ***Exhibit "F"***) Since a vigorous cross-examination by trial

counsel is a basic ingredient of any effective defense, the particular representation in

Petitioner's case was singularly damaging. In the first instance, it is axiomatic that

cross-examination of pre-statement wavier of constitutional rights is not only universally

expected, but also necessary. In the instant case, that was not done such that the

finding of the proper <u>Miranda</u> rights was based on an insufficient records.

Secondly, counsel has the ability to "suppress" a statement at trial. For example,

a vigorous cross-examination before a jury gives that fact-finding body  (the jury) the

ability to reject all the Petitioner's statement, part of the Petitioner's statement and/or

none of that statement. However, in the Petitioner's case, trial counsel was committed

to mysteriously benign approach which actually gave no option to the jury.  Since the essence of cross-examination is to create reasonable doubt, trial counsel's lame desire to not "upset" the judge (or prosecution) falls woefully short of an effective defense.

Furthermore, the proposition that the trial counsel's performance affected the outcome of the case is eminently clear.  How can any trial counsel serve the client effectively and properly by conceding cross-examination became of a wish to "not upset" the Court or Prosecutor?  The nature of cross-examination is to inquire, probe, confront and (inherent in that process) not to please other parties and/or the Court.  This in no way suggests that cross-examination should violate ethical considerations or pursue contemptuous behavior.  However effective cross-examination, by its very nature, confronts the testimony and evidence in manners and tactics which do not and probably should not please others in the Court (beside the defendant).

Consequently, the shear ridiculousness of telling a Defendant that trial counsel doesn't want to confront or upset the Government or the Court simply reduces the adversarial process to a functionary.  Pursuant to the Strickland test, such trial counsel behavior is not ineffective if it "might be considered sound trial strategy", and therefore, tactics in a trial take on multiple colorations, forms and vehicles deemed to be reasonably successful in the defense of a client's case.  However, Strickland also holds that trial counsel's must function as "counsel" exercising sufficient skill to comport with the Sixth Amendment protections and that the deficient performance prejudiced the defense.

In the instant case, if the tactic of putting irrelevant defense witness on the stand is put aside, the <u>one</u> constant in the arsenal of the defense trial caused was <u>cross-examination</u>.  To tell the Defendant that this one live round in trial counsel's weapon was not being fired effectively emasculated the defense into non-existence.

It is submitted that the failure to properly cross-examine should not be examined in a vacuum but in tandem with the other submitted argument, i.e., that the defense witnesses presented at trial provided an extension of an ineffective defense case.

Lastly, it should be noted that Petitioner's trial counsel at no time pursued the issue of the possible collusive effects by Petitioner's prior counsel (Marchetta) with the Government agents since it was within that context that the impetus for Petitioner's statements were given.  In ***United States v. Marshank***, 777 F. Supp. 1507 (N.D. Cal., 1991) the court found that "the government's collaboration with the defendant's attorney to build the case against the defendant, to effect the defendant's arrest, and to ensure the defendant would cooperate with the government rather than contest charges against him <u>was prosecutorial misconduct that violated due process</u>.  The government used the attorney's other clients to develop the case against the defendant ...and encouraged the defendant to contact the attorney following his arrest." In other words, if in fact, Petitioner's trial counsel did not pursue a cross-examination of the possible misleading by agents through prior defense counsel, then arguably a critical issue was intentionally abandoned (counsel as a government agent).  It is clear that this issue was not pursued at any time as cross-examination, especially in light of the entrapment defense advanced at trial, (i.e. was the entrapment a collusive effect?)  Therefore, Petitioner was again deprived of effective counsel by the removal of another viable consideration to be

bought before the jury. Whether Petitioner's counsel did not pursue the connection (Marchetta-McCarron-Cook) out of a wish to not "upset" anyone or not to inquire into due to professional friendships is irrelevant. In either case, the failure to pursue these issues was frail strategy and did, in fact, prejudice the Petitioner. The critical issue not pursued was not only the possible complicity of prior counsel and government agents, but whether those agents actually suggested or recruited Petitioner's counsel, and, if so, the effect on Petitioner's entrapment defense and/or due process rights.

Also, trial counsel previously agreed with Petitioner to pursue those collusive tactics as part of the defense strategy. On this premise by trial counsel, the Petitioner relied and expected an effective defense (which never materialized). However, none of these promised strategies materialized resulting in a litany of ineffective trial issues.

To show that counsel was in effective, Petitioner "must point to specific instances in the record to suggest an actual conflict ..... and demonstrate that the attorney made a choice [which resulted in prejudice to his client]." *United States v. Mays* 77 F.3d 906 (6th Cir. 1996) (citing *United States v. Hopkins*, 43 F.3d 1116 (6th Cir., 1995). The Petitioner's showing further requires that the attorney had made choices concerning evidentiary matters, then that choice must be shown to prejudice the client. However, if a plausible defense is foreclosed or a material fractured or legal issue is diverted (including appellate rights), then such representation is deemed ineffective. The Eleventh Circuit in *United States v. McCutcheon*, 86 F.3d 187 (11th Cir. 1996) dealt with an analogous situation wherein an attorney compromised his client's rights (by representing previously a witness who would testify against a current client). While

*McCutcheon* on its face may not directly relate to Petitioner herein, it is absolutely critical to note that *McCutcheon* leans heavily on *Glasser v. United States*, 315 U.S. 60 (1942) wherein the Court held that the failure of counsel to cross-examine adequately was ineffective and counsel failed to resist the introduction of inadmissible evidence to protect a co-defendant.  In Petitioner's case, it is submitted that <u>trial counsel</u> <u>admitted</u> that cross-examination would not be pursued as legal issues and further appeared to do so to protest and/or tactfully ignore the previous attorney-client violations (as discussed herein) without sufficient reason to do so.  It is presumed that if those omissions by counsel were not simply errors, the alternative conclusion can be that allegiances and/or referrals were in part owed to the prior counsel.  See *Roe v. Flores – Ortega*, 528 U.S. 470 (2000).


Section B.    INEFFECTIVE ASSISTANCE OF COUNSEL DUE TO BREACH OF ATTORNEY-CLIENT PRIVILEDGE

i.    Petitioner's former Attorney, Scott Hecker, breached the attorney-client confidentiality privilege in revealing to Attorney Bruce Lyons, counsel for co-defendant Blake Beeson, by indicating that drug testing results indicated the ecstasy narcotic drug residue as "MDA" as opposed to the charged offense of "MDMA." Co-Defendant Beeson pled to the original MDMA indictment thereby receiving a sentence which was not commensurate with Petitioner's sentence, who received a four point upward adjustment based upon the MDA guideline.  That information solely became available to the prosecution discovering that disparity (or adjustment) directly through the breach of

26

confidentiality by Petitioner's Attorney Hecker.  In other words, once Beeson had been sentenced through the MDMA guidelines, the only conceivable vehicle for Petitioner's MDA sentence was the improper trading of information by Petitioner's counsel. Incredibly, Beeson remained sentenced under the MDMA lower guideline, which Petitioner received the higher guideline sentence for the same offense involving the same narcotic.

     ii.     Furthermore, the disparity in sentencing not only was violated by the attorney-client confidentiality breach, but also, no attempt was made by trial counsel to present the myriad of equal protection and due process applications (Defendants were sentenced to separate punishments based upon enhancements which should be equally applicable).  However, trial counsel at no time raised said issues (and the failure to file proper P.S.I. objections is addressed herein separately).  Furthermore, not only were these matters not raised (either in motions attaching the indictment or in parallel motions), but the exact impetus for the disparity in sentencing was the ineffectiveness of counsel; i.e. voicing a confidential detrimental statement to counsel for an antagonistic Co-Defendant which in turn was relayed to the Prosecutor.  Ineffectiveness of counsel can occur in several ways, most often in the failure to perform an investigation or trial obligation (or in the wrongful performance of those matters). However, it is clear that the confidential information between the attorney and client is one of the most sacred obligations.  Included in that obligation is the absolute mandate that a client's counsel will not purposefully recklessly or negligently create, incur or set into motion any matter contrary to his client's interest.  Once Attorney Hecker passed

along the confidential information (obtained by one of the Petitioner's agents) that MDA existed in place of MDMA, the Petitioner's right to effective counsel (and confidentialities included therein) was breached.  Therefore, the Petitioner did not and could not have received effective assistance of counsel.

Lastly, the information betrayed by Attorney Hecker was further tainted by his knowing that Beeson's counsel was in the process of negotiations.  This fact was compounded by Petitioner's counsel Hecker further mistaking that the MDA/MDMA distinction would create beneficial sentencing alternatives.  Consequently, the error was compounded by not only the revelation of that privileged information but by the mistaken interpretation of the nature of that information – all of which contributed to counsel's ineffectiveness.

Section C.    THE EXTRACTION OF THE WAIVER OF APPEAL FROM DEFENDANT CONSTITUTED INEFFECTIVE COUNSEL ASSISTANCE

i.    Petitioner's trial counsel extracted from Petitioner a waiver of appeal on the alleged against that the Government would not appeal a downward departure at sentencing. It is clear that the cross-appeal for the downward departure by the Government had little or no chance of succeeding an appeal.  Since the trial issues included the Petitioner's mental condition (i.e., depressions, inability to make proper judgments) which was substantial by professional medical opinion, such waiver was at best problematic.  The issues to be addressed on appeal were fairly significant, particularly in light of Petitioner's suppression of his statements.  The issues of the proper giving of Miranda rights and/or the initial step were certainly appealable issues

(and it could be argued that those issues were sufficiently substantial to allow a consideration by the prosecutor as to whether a misdemeanor (or lesser felony) would be offered).

Furthermore, since the Petitioner was a Canadian citizen and this fact was made known to the government agents, the issue as to whether Petitioner could contact Canadian counsel pursuant to the Vienna Convention Treaty was at issue. The foreign citizen issue was further amplified by the recurring issue of whether proper <u>Miranda</u> rights were ever given. The consulate office advisory would have been to not make any statements without an attorney, a fact which Petitioner's Trial counsel advised petitioner was not considered, research or pursued. The consequence of trial counsel's admissions in light of extracting Petitioner's waiver of appeal was presumptively negligent. Trial counsel is bound to, at a minimum, file an appeal notice on issues which may be prima facie appealable and/or have a reasonable viability. This is particularly done when issues are brought to counsel's attention wherein the actual research need be done.

Instead of researching these issues and giving Petitioner a considered opinion, trial counsel chose to present a waiver of appeal without analyzing and researching those issues a few minutes for sentencing.

Trial counsel had the report of psychologist Dr. Thomas Bonner, attached hereto as ***Exhibit "G",*** at the time of sentencing and was keenly aware of Petitioner's psychological state, i.e. that Petitioner received a two-point reduction at sentencing due

to diminished capacity/abhorrent behavior confirmed by psychological testing presented at sentencing (March 7, 2001 which was a few days prior to the waiver of appeal).

ii.     The effect of that waiver of appeal caused the Petitioner's rights of arguing those matters addressed on direct appeal to evaporate, and therefore, Petitioner's options were drastically limited to issues addressed in a 28 U.S.C. §2255 petition, wherein remedies are severely limited for the purpose of evidentiary hearing. Therefore, it is submitted that unlike the overwhelming majority of §2255 petitioners brought before the courts (wherein the direct appeal has been heard and/or there is a successive §2255 or §2241 petition), Petitioner's §2255 not only presents issues as to trial counsel's performance during the course of pre-trial, and trial proceedings, but also, whether those matters ordinarily reviewable on direct appeal have been ab initio taken away by an ineffective act of counsel. In other words, the forced waiver by a client in a known psychological deleterious state of his direct appeal rights by the negligent act of a trial counsel constitutes an ineffective representation by that counsel. To further elucidate the issues, the negligent ineffectiveness of counsel in extracting that waive in itself relegates the remedies of Petitioner to the limitation of §2255.

In fact, it may be argued that the most insidious danger ineffectiveness claims is caused by a waiver of direct appeal since no issues required to be litigated in that direct appeal may now be addressed.

It is submitted that the waiver of appeal caused the elimination of allegedly viable appeal issues which were actually cited by trial counsel in Petitioner's motion for

as to <u>whether</u> the notice of appeal was properly filed could be rejected out-of-hand and remanded for an evidentiary hearing.

As argued herein, the Court found that the real danger was that the absence of a direct appeal "obligated (Solis) to raise any and all of his direct appeal issue in his §2255 petition..... The District Court should have held a hearing to determine the truthfulness of his claim. The District Court's solution .... requiring consolidation of direct and collateral appeals ... is not an adequate substitute. See *__also United States v. Gitner__*, 972 F.2d 1559 (11th Cir., 1992). Also see *McHale v. United States*, 175 F. 3d 115 (2d Cir., 1999) ("Petitioner need not demonstrate that, but for the ineffectiveness of counsel, such an appeal would have succeeded or even would have had merit").

It is of particular importance to Petitioner's case that *Apprendi* and its progeny (herein discussed), which would have been applicable on direct appeal *(Apprendi* was decided in June, 2000; Petitioner's conviction occurring in November, 2000) are now subject to §2255 requirements. The detriment in raising *Apprendi* is §2255 petitions are obvious since, as stated herein, the Petitioner must now apply *Apprendi* though the formidable hurdles of retroactivity, *Teague, Harris*, etc. At the time of Petitioner's conviction, *Apprendi* had been decided and obviously would have been available for direct appeal applications, all of which were never explained to Petitioner on the alleged basis of no viable appellate issues – a point not well-taken in light of *Apprendi* and other trial issues herein discussed. To further confirm the road being traveled by misinformation to Petitioner ( in an appeal waiver), no objections (as discussed herein) were made under then-existing law to the Pre-Sentence Report. The compendium of these acts rendered

Petitioner subject to ineffective counsel on several levels.  However, the substantial loss of the direct appeal based upon the foregoing series of ineffectiveness were of unqualified prejudice.

Section D.    TRIAL STRATEGY PRESENTING DEFENSE CASE BY DEFENSE COUNSEL CONSITUTED INEFFECTIVE ASSISTANCE

The trial presentation by defense counsel before the jury consisted of presenting witnesses on behalf of the defense Defendant which were nothing more than witnesses testifying that the Defendant was a "good guy."  The value of that testimony in the defense case was non-existent particularly since such testimony did not address an issues at trial. Arguably, such testimony would be more relevant to a sentencing hearing and consequently, the Defendant's trial became nothing more than a sentencing proceeding.  Whether these proceedings were done as a "defense strategy" or as an effort "not to antagonize the judge or prosecutor" would (either way) constitute ineffective assistance since the defense case really had no trial value.

At its core, a defense case requires counsel to minimally or at least tangentially address factual issues to be determined by the jury.  No reasonable scenario can be found to define any effect of the defense witnesses as related to trial issues (as opposed to sentencing). The consequence of defense counsel's strategy was to present an extended plea and sentencing hearing.

Since the defense witnesses testified as to certain "depression" suffered by the Defendant, the trial counsel clearly was remiss in not offering the professional opinion at trial of Dr. Thomas Bonner who, in fact, testified at Defendant's sentencing hearing.

33

There is no indication that the psychological status of Defendant would have been any different from the time of trial (November, 2000) to the date of sentencing (March, 2001) and therefore, relevant to the defense case. While there is no suggestion that Dr. Bonner's testimony at trial would have accomplished an effective assistance of counsel in presenting a defense, the presentation of the civilian defense witnesses served virtually no purpose, and thus, deprived the Defendant of a competent defense. If the Sixth Amendment guarantees anything, it is the right to a defendant of an attorney who can effectively prepare a trial strategy and effectively represent him at trial. In order for this right to be realized, there must be full and frank disclosure (and agreement) between counsel and the defendant.

### POINT II

In 1999, the Supreme Court in *Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999), held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." Thereafter, the Supreme Court expanded its holding in *Jones* in two cases.

In *Castillo v. United States*, 120 S.Ct. 2090 (2000), the Supreme Court held that the type of weapon possessed by a defendant was an essential element of 18 U.S.C. § 924(c). In so ruling, the Supreme held that punishment-enhancing factors are to be considered "elements" of an aggravated, separate statutory offense -- and that such elements are to be alleged in the indictment, proved to the jury at trial, and found by the jury beyond a reasonable doubt before the "enhanced sentence may constitutionally be applied." *Castillo*, 120 S.Ct. at 2095-2096. A few months later, the Supreme Court reiterated this principle in *Apprendi v. New Jersey*, 120 S.Ct. 2348, 2362-2363 (U.S. 2000), holding that "[i]t is unconstitutional for a legislature to remove from the jury the

assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." The Supreme Court then equated such sentence-enhancing factors to "elements" of the offense itself:

> [W]hen the term `sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, *it is the functional equivalent of an element* of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an `element' of the offense."

*Apprendi,* 120 S.Ct. at 2364-2365 & n.19.[12]

In *United States v. Rogers,* 228 F.3d 1318 (11th Cir. 2000), the United States Court of Appeals for the Eleventh Circuit applied the rationale of *Apprendi* to Title 21 drug charges. Thus, the Eleventh Circuit in *Rogers* that drug "quantity in section 841(b)(1)(A) and section 841(b)(1)(B) cases must be charged in the indictment and proven to a jury beyond a reasonable doubt in light of *Apprendi.*" *Rogers,* 228 F.3d at 1327. Other circuits have reached the same result and now consider drug quantity to be an essential element of charges brought under Title 21. *See, e.g., United States v. Doggett,* 230 F.3d 160 (5th Cir. 2000); *United States v. Nordby,* 225 F.3d 1053 (9th Cir. 2000); *United States v. Sheppard,* 219 F.3d 766 (8th Cir. 2000).

## POINT III

### *Petitioner Is Entitled To Relief Under Section 2255*

In addition to the arguments set forth in Point One which entitle the Petitioner for relief due to ineffective assistance of trial counsel, *Apprendi* is a jurisdictional issue which requires retroactive application. The issue of whether challenges to Title 21 convictions based on indictments invalidated under *Apprendi* are retroactive to cases on initial

collateral review is governed by *Teague v. Lane,* 489 U.S. 288 (1989). The Eleventh

Circuit's categorization of *Apprendi* errors in *United States v. McCoy,* 266 F.3d 1245

11th Cir. 2001), as not being retroactive because they are not jurisdictional in nature is

misplaced and based upon a faulty premise.[13]

In *McCoy*, the Eleventh Circuit came to the conclusion that *Apprendi* error based

upon an indictment that does not notice an element of the offense (such as drug quantity

in the §841 context) is not jurisdictional in nature. The Court reached that conclusion

based upon the following analogy:

> [t]he constitutional right to be charged by a grand jury is a personal right of
> the defendant and does not go to the district court's subject matter
> jurisdiction because it may be waived. *See* Fed.R.Crim.P. 7(b). Thus, the
> constitutional right to be charged by a grand jury indictment simply does not
> fit the mold of a jurisdictional defect, because it is a right that can be waived.

*Id.* at 1249.

The opinion neglects to mention that when a defendant waives indictment, it is

replaced with an information which serves, at the very least, as legally sufficient notice to

the defendant of the charges which he must face and their penalties, -- and -- preserves

a defendant's right to challenge jurisdictional defects in the charging instrument. See,

*United States v. Borja,* 191 F.Supp. 563 (D.C. Guam 1961); and *United States v.*

*Hearne,* 6 F.R.D. 294 (E.D. Wis. 1946).

Therefore, it is axiomatic that requiring *neither* an indictment, *nor* an information

*would* constitute a structural error of the highest degree -- particularly in the sentencing

context. Further, merely retaining subject matter jurisdiction to *try* the case does not

mean that the district court retains jurisdiction to *sentence* the defendant when such a

sentence would be based on charges not stated in the indictment or the information (if the indictment were waived), nor authorized by the jury's verdict. *See United States v. Gonzalez,* 259 F.3d 355, 360-61, n. 3 (5th Cir. 2001)( "the district court lacks the jurisdiction to impose a sentence exceeding the statutory maximum of the offense alleged in the indictment...").

## *Teague* Analysis

The Supreme Court in *Teague* held that a right that has been newly recognized by the Supreme Court is not to be applied retroactively on collateral review *unless* it falls within one of two exceptions. First, a new rule should apply retroactively if it prevents law-making authority from criminalizing certain kinds of conduct. *Teague,* 489 U.S. at 307. Second, a new rule should apply retroactively if it "requires the observance of the procedures `implicit in the concept of ordered liberty.'" *Id.* (citations omitted). The Supreme Court has described this exception as applying to "watershed rules fundamental to the integrity of the criminal proceeding." *Sawyer v. Smith,* 497 U.S. 227, 234 (1990). *Accord Saffle v. Parks,* 494 U.S. 484, 495 (1990). To qualify under the second *Teague* exception, "the new rule must satisfy a two-pronged test: (1) it must relate to the accuracy of the [proceeding]; and (2) it must alter "our understanding of the `bedrock procedural elements' essential to the [fundamental] fairness of a proceeding." *Nutter v. White,* 39 F.3d 1154, 1157 (11th Cir. 1994) (quoting *Sawyer,* 497 U.S. at 242).

**A.    *Apprendi* Announced a "New" Rule**

The Petitioner concedes that the rule announced in *Apprendi* is a "new" rule subject to *Teague*. In *Teague,* the Court explained that "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or Federal Government.... To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Teague,* 489 U.S. at 301. To determine whether a rule announced in *Apprendi* is "new," the Court must assess the state of the law as it existed at the time Petitioner's conviction became final and then determine whether the Court should have felt compelled to adopt the rule at issue. *O'Dell v. Netherland,* 521 U.S. 151, 159 (1997). If, in light of existing law, the Court acted reasonably by not recognizing the rule when Petitioner was indicted, convicted and sentenced in 1995, the rule is "new" under *Teague. See id.* ("*Teague* asks court-court judges to judge reasonably, not presciently"). *See also Cain v. Redman,* 947 F.2d 817, 821 (6th Cir. 1991) (a rule sought by federal habeas corpus petition is "new" as along as the correctness of the rule is susceptible to debate among reasonable minds) (citing *Butler v. McKellar,* 494 U.S. 407 (1990).

The rule announced in *Apprendi* is surely "new" for purposes of *Teague.* In *Jones,* the Court noted that its prior cases merely "suggest[ed] rather than establish[ed]" the principle that any fact that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proved beyond a reasonable doubt." *Jones,* 526 U.S. at 243 n. 6. Moreover, before *Jones,* virtually every circuit held that the amount of drugs was not an element of a Title 21 offense but instead was only a sentencing factor.[14] Indeed, even after *Jones,* the Eleventh Circuit and others continued to find that the

quantity of drugs was a sentencing factor. *See United States v. Hester,* 199 F.3d 1287, 1291-92 (11th Cir. 2000).[15] The fact that so many courts consistently followed a practice contrary to the rule announced in *Apprendi* is compelling evidence that the rule is new. *See Redman,* 947 F.2d at 821. The sheer number of opinions in *Apprendi*[16] also supports the conclusion that the rule was not compelled by pre-existing precedent. *O'Dell,* 521 U.S. at 159 ("[t]he array of views expressed in [a Supreme Court decision] itself suggest the rule announced there was, in light of the court's precedent, `susceptible to debate among reasonable minds'").

At the time of Petitioner's conviction in November 2000, existing law plainly did not compel the Court to require grand and petit juries to pass upon drug quantity. Accordingly, the rule announced in *Apprendi* is "new."

### B. *Apprendi* Claims Fall Within The Second *Teague* Exception

The rule announced in *Apprendi* is also a "watershed" rule that requires retroactive application. The reasoning employed by the Eleventh Circuit in *Nutter v. White,* 39 F.3d 1154 (11th Cir. 1994), compels this result.

In *Nutter,* the Eleventh Circuit had to decide whether the rule announced in *Cage v. Louisiana,* 498 U.S. 39 (1990) (per curiam), was retroactive under the second *Teague* exception. In *Cage,* the Supreme Court found a jury instruction that contained language diluting the reasonable doubt standard violated due process because it allowed the jury to convict on a lower standard of proof than beyond a reasonable doubt. *Cage,* 498 U.S. at 41. In *Sullivan v. Louisiana,* 508 U.S. 275 (1993), the Supreme Court held that *Cage*

violations, when challenged on direct appeal, were not subject to harmless error but were, instead, *per se* reversible.   The Court reasoned that harmless error review was only possible where the petit jury actually passed upon the statutory element:

> Harmless-error review looks, we have said, to the basis on which "the jury ***actually rested its verdict***, [citation omitted].  The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely attributable to the error.  That must be so, because to hypothesize a guilty verdict that was never in fact rendered -- no matter how inescapable the findings to support that verdict might be -- would violate the jury trial guarantees.  [Citations omitted.]

*Sullivan,* 508 U.S. at 280-81 (emphasis in original).

In ***Nutter v. White,*** 39 F.3d 1154 (11th Cir. 1994), the Eleventh Circuit, relying on *Sullivan,* held that the rule announced in ***Cage*** was subject to review on collateral attack. The Court reasoned that the rule fell within the second ***Teague*** exception because it "guards against conviction of the innocent by ensuring the ***systematic*** accuracy of the criminal system." ***Nutter,*** 39 F.3d at 1157 (emphasis added).  Moreover, the *Cage* rule satisfied the "fairness" prong of ***Teague's*** second exception as it "implicate[d] a fundamental guarantee of trial procedure because use of a lower standard of proof frustrates the jury-trial guarantee." *Id.* at 1158.  *Accord* ***Harmon v. Marshall,*** 69 F.3d 963, 964-65 (9th Cir. 1995) (holding ***Cage*** retroactive under ***Teague***); ***Adams v. Aiken,*** 41 F.3d 175, 178-179 (4th Cir. 1994) (same).  *See also,* ***Ashley v. United States,*** 266 F.3d 671 (7th Cir. 2001)(holding that *Apprendi* claims brought pursuant to paragraph 6, subpara. (3) are not time barred, because the language of that paragraph is less restrictive than paragraph 8, subparagraph (2) regarding successive petitions).

In *Ashley,* the Seventh Circuit interpreted and applied these provisions to an initial

2255 filed more than one year after the Ashley's conviction became final, and reversed the

District Court's ruling which erroneously held that Para. 8, subpara. (2) was functionally

identical to Para. 6, subpara. (3), and, therefore, rejected Ashley's argument that his

application is timely under subpara. (3) because it was filed within one year of *Apprendi.*

In reaching it's decision, the Seventh Circuit noted that the District Court's reliance

on prior opinions holding that an appellate court may authorize a second or successive

under § 2255, Para. 8, subpara. (2) (federal prisoners) or § 2244(b)(2)(A) (state prisoners)

"only if the Supreme Court itself has made the retroactivity decision,"[17] – was misplaced.

The Seventh Circuit explained that the two provisions are different, and must be applied

differently, least the Supreme Court would never have an opportunity to address the

retroactivity issue.  The Seventh Circuit opined:

> An *initial* petition may be filed within a year of a decision that is "made
> retroactively applicable to cases on collateral review[.]" A *second* petition, by
> contrast, depends on "a new rule of constitutional law, made retroactive to
> cases on collateral review *by the Supreme Court*" (emphasis added). Both
> statutes make it clear that only the Supreme Court may issue the new
> decision. But who decides whether that new decision applies retroactively?
> The first formulation ("made retroactive") leaves that question open. The
> second formulation ("made retroactive ... by the Supreme Court") answers
> it. To treat the first formulation as identical to the second is not faithful to
> the difference in language. By omitting the restriction contained in § 8(2), §
> 6(3) implies that courts of appeals and district courts may "make" the
> retroactivity decision. *Tyler* concludes that the word "made" in § 8(2) means
> "held." --- U.S. at ----, 121 S.Ct. at 2483. District and appellate courts, no
> less than the Supreme Court, may issue opinions "holding" that a decision
> applies retroactively to cases on collateral review. The jurisdictional (and
> precedential) scope of that holding differs, but it is a holding nonetheless.

At least three reasons justify the difference between § 6(3) and § 8(2). First, permitting

a district or appellate court to make the retroactivity decision for an initial petition may be

essential to put the question before the Supreme Court for final resolution. How else would

a retroactivity question get before the Supreme Court so that it could make the decision

that would in turn authorize second or successive petitions? Second, as the Supreme Court

emphasized in *Tyler,* --- U.S. at ----, 121 S.Ct. at 2483, a court of appeals has only 30 days

to decide whether a second or successive petition may be filed. Shortness of time implies

a mechanical process; all the court need do is look up an answer in the United States

Reports. No such time limit attends an initial petition for collateral review, so courts have

time to apply the retroactivity criteria in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060,

103 L.Ed.2d 334 (1989), to novel decisions of the Supreme Court. Third, the conditions for

filing successive petitions are substantively as well as procedurally more restrictive; having

had one full opportunity to wage a collateral attack, the prisoner cannot demand another

on the same terms. Yet on the district court's view it is as hard to launch an initial collateral

attack as a subsequent one.

There remains the requirement that *some* court make the decision retroactive. The

one year to file under § 6(3) begins, not on the date of the Supreme Court's decision newly

recognizing a constitutional right, but on the date that decision is "made retroactive".

Otherwise § 6(3) is a mirage, for retroactivity decisions often come more than a year after

opinions newly recognizing constitutional rights. Although this question has occasioned

disagreement among the courts of appeals, see *United States v. Lloyd*, 188 F.3d 184,

188 n. 10 (3d Cir.1999) (collecting cases), the cases holding that the time starts from the

Supreme Court's decision, rather than from the date that decision is held to be retroactive,

do not explain how this leaves any work for § 6(3) to do given the inevitable gap between

42

the main decision and the retroactivity decision. One can imagine a serious problem in the application of § 6(3) if, for example, the ninth circuit should declare a given decision retroactive on January 15 of a given year, while the seventh circuit declares it retroactive on July 15 of that year. Does the year run from January 15 or July 15? The latter is more sensible: Having time run from a retroactivity decision made by the court with territorial jurisdiction produces certainty in application....*Ashley,* at 673-74 (emphasis in original).

Moreover, the rule announced in *Apprendi* alters a defendant's rights in all the ways recognized in *Cage* and *Sullivan,* and more. As in *Cage,* the new rule elevates the burden of proof to beyond a reasonable doubt. Moreover, the new rule requires the element to be presented to and passed upon by the grand jury, as required by the Presentment Clause of the Fifth Amendment. Imposing an enhanced penalty based on facts not alleged in an indictment impermissibly allows a defendant to be sentenced "on a charge the grand jury never made against him." *Stirone,* 361 U.S. at 219. *See also, Russell v. United States,* 369 U.S. 749 (1962) (holding that to permit defendants to "be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him," would deprive them "of a basic protection which the guaranty of the intervention of the grand jury was designed to secure"). Thus, the rule in *Apprendi* "not only improve[s] accuracy [of the trial and conviction], but also `"alter[s] our understanding of the bedrock procedural elements"' essential to the fairness of a proceeding." *Sawyer,* 497 U.S. at 242 (citations omitted).

Both the majority and dissenting opinions in *Apprendi* recognized the significance of the case. As the majority correctly perceived:

> At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury," Amdt. 6. Taken together, these rights indisputably entitled a criminal defendant to "a jury determination that [he] is charged, beyond a reasonable doubt."

*Apprendi,* 120 S.Ct. at 2355-2356. *See also **In re Winship,*** 397 U.S. 358, 363 (1970) (reasonable doubt requirement "has vital role in our criminal procedure").

In a footnote, the Supreme Court also recognized that its holding implicated the Presentment Clause of the Fifth Amendment, although that issue had been raised by Apprendi. *Apprendi,* 120 S.Ct. at 2355, n. 3. The Supreme Court ultimately concluded that the New Jersey procedure that allowed a judge to determine an aggravating factor that extended the defendant's sentence an additional 10 years constituted "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system." *Id.* at 2366. Conversely, Justice O'Connor's dissent pointed out that *Apprendi* "will surely be remembered as a watershed change in constitutional law." *See id.* at 2380 (O'Connor, J., dissenting). Thus, the justices strongly suggested that the new rule announced in *Apprendi* implicated bedrock procedures that are implicit in the concept of ordered liberty and that impact the fundamental fairness of the criminal justice system.

Accordingly, several courts have held that *Apprendi* claims fall within the second *Teague* exception and applies to cases on initial collateral review.[18] For example, the Eighth Circuit has repeatedly accepted review of *Apprendi* claims in initial Section 2255 motions. *See, e.g., **United States v. Nicholson,*** 231 F.3d 445, 454 (8th Cir. 2000);

*Rogers v. United States*, 229 F.3d 704, 705 (8th Cir. 2000). Similarly, in *United States v. Murphy*, 109 F. Supp. 2d 1059 (D. Minn. 2000), the court held that "[t]here can be little doubt that the sweeping new requirement announced by the Court in *Apprendi* is so grounded in fundamental fairness that it may be considered of watershed importance." *Murphy*, 109 F. Supp. 2d at 1064. The *Murphy* court noted that the Supreme Court's conclusion in *Apprendi* that the Constitution requires a jury finding beyond a reasonable doubt on any fact which increases the statutory maximum penalty "compels a radical shift in criminal procedure in federal criminal cases." *Id.* The *Murphy* court rejected the argument that there is no significant difference between a district court finding of fact by a preponderance of the evidence as to drug quantity and a jury finding of proof beyond a reasonable doubt as to the quantity issue. Quoting from the Supreme Court itself in *Apprendi* and in *Winship*, 297 U.S. 358 (1970), the *Murphy* Court explained:

> "There is *a vast difference between* ... a judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof." 120 S. Ct. at 2366; *see also In re Winship*, 397 U.S. 358, 363, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970) (quoting *Coffin v. United States*, 156 U.S. 432, 453, 15 S. Ct. 394, 39 L.Ed. 481 (1895)) ("The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock `axiomatic and elementary' principle whose `enforcement lies at the foundation of the administration of our criminal law.'").

*Id.* at 1064 (emphasis added).  The ***Murphy*** court, therefore, concluded that the

***Apprendi*** decision falls under the second exception to the ***Teague*** non-retroactivity

principle. *Accord **Darity v. United States**,* 124 F. Supp. 2d 355 (W.D.N.C. 2000).

Those courts that have decided to the contrary[19] generally have relied upon

decisions construing the retroactivity of ***United States v. Gaudin**,* 515 U.S. 506 (1995).

In ***Gaudin*,** the Supreme Court held that in a false statement prosecution, the question

of materiality must be decided by the jury instead of by the court.  Several circuits,

including the Eleventh Circuit, have declined to give retroactive effect to ***Gaudin*** under

***Teague.*** *See **United States v. Swindall**,* 107 F.3d 831, 835-36 (11th Cir. 1997);

***Bilzerian v. United States**,* 127 F.3d 237, 241 (2d Cir. 1997), *cert. denied,* 527 U.S.

1021 (1999); ***United States v. Shunk**,* 113 F.3d 31, 37 (5th Cir. 1997). ***Gaudin*,**

however, involved far less significant principles than *Apprendi.*

As noted by the Eleventh Circuit in ***Swindall*,** the harm to be corrected by ***Gaudin***

was not the violation of the "beyond a reasonable doubt" standard which "implicate[d] the

accuracy of the conviction." ***Swindall*,** 107 F.3d at 836.  Rather, the problem to be

corrected in ***Gaudin*** was that "the wrong entity was making the decision." *Id.* The Court

explained that, if Swindall contended that "the judge used a less exacting standard than

`beyond a reasonable doubt' in its determination that the false statements were material,"

this "would implicate the accuracy of the materiality finding," and, thus, would fall within

the scope of ***Teague's*** second exception. *Id.*

In the instant case, this Court did, in fact, use a less exacting standard than beyond

a reasonable doubt in its determination of drug quantity and thereby implicated the

accuracy of the quantity finding.  Therefore, the **Apprendi** error at issue in this case clearly falls within the scope of *Teague*'s second exception.  Accordingly, for all of the foregoing reasons, **Apprendi** has retroactive application to initial Section 2255 motions such as the Petitioner's motion.

### C. Jurisdictional Defects Are Not Subject To Procedural Default

Jurisdictional defects cannot be procedurally defaulted by the absence of cause and prejudice.  **Harris v. United States**, 149 F.3d 1304 (11th Cir. 1998);  **Kelly v. United States**, 29 F.3d 1107 (7th Cir. 1994).  In the same way that the district courts in **Harris** and **Kelly** lacked jurisdiction to enhance a sentence unless the government strictly complied with the procedural requirement of 21 U.S.C. § 851(a), the Court here lacked jurisdiction to enhance Petitioner's sentence based upon amount because such an enhancement required determinations by the grand and petit juries.  *See* argument *supra*.  Moreover, since jurisdictional defects are non-waivable and non-defaultable, they are properly remedied -- indeed they **must** be remedied -- upon Section 2255 review.  *See* **Harris**, 149 F.3d at 1308 (holding that, because jurisdictional defects cannot be procedurally defaulted and the district court did not have jurisdiction to impose an enhanced sentence, relief under Section 2255 must be granted although the defendant failed to object to the enhanced sentence at trial or on appeal);  **Kelly**, 29 F.3d 1107 (same).[20]

## **CONCLUSION**

WHEREFORE, the PETITIONER, by and through undersigned counsel, prays that the

Court grant his all relief to which he may be entitled in this proceeding, and grant his an

evidentiary hearing as to all issues raised herein.


Respectfully submitted,


Eugene F. Zenobi, Esq.
Attorney for Richard Scriver
325 Almeria Avenue
Coral Gables, FL 33134
305-461-5444
FBN  0130269

48

JURAT

I, RICHARD SCRIVER, HEREBY AFFIRM THAT I HAVE PERSONAL KNOWLEDGE
OF THE FACTS AND MATTERS HEREIN SET FORTH AND ALLEGED AND THAT
EACH AND ALL OF THESE FACTS AND MATTER ARE TRUE AND CORRECT.

_____
RICHARD SCRIVER

STATE OF FLORIDA
COUNTY OF _____

     BEFORE ME, THE UNDERSIGNED AUTHORITY ON
_____MARCH 3____, 2002, PERSONALLY CAME AND APPEARED RICHARD
SCRIVER WHO EITHER PERSONALY KNOWON TO ME OR HAS PRODUCED
PHOTOGRAPHIC IDENTIFICATION (INMATE ACCOUNT CARD)

_____
NOTARY PUBLIC, STATE OF FLORIDA

I, EUGENE ZENOBI, DO SOLEMNLY SWEAR THAT ON MARCH 3, 2002 I

PERSONALLY WITNESSED THE SIGNATURE OF RICHARD SCRIVER, WHO I

PERSONALLY KNOW, AT FCC COLEMAN.  THE FACILITY DID NOT HAVE A

NOTARY PUBLIC AVAILABLE TO WITNESS MR. SCRIVER'S SIGNATURE.

HOWEVER, MR SCRIVER DID READ THE FOREGOING JURAT AND THAT ALL THE

FACTS CONTAINED THEREIN ARE TRUE AND CORRECT TO THE BEST OF HIS

KNOWLEDGE.


_____
EUGENE ZENOBI, ESQ.

State of Florida)
County of _DADE_ )

Before me, the undersigned authority, personally appeared EUGENE
ZENOBI who after being duly sworn deposes and says that the foregoing
Complaint has been read and the facts contained therein are true.

SWORN TO AND SUBSCRIBED before me this 4 day of
March , 2002

MARIA TERESA ORTEGA
COMMISSION # CC 723869
EXPIRES MAR 11, 2002
BONDED THRU
ATLANTIC BONDING CO., INC.

NOTARY PUBLIC
State of Florida at Large

X Personally Known
___ Produced identification -  Type of identification produced

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a correct and true copy of the foregoing was furnished by U.S. Mail to: ***Dana Washington, Esq.,*** Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132, on this 6TH day of MARCH_____, 2002.

EUGENE F. ZENOBI, ESQ.

EUGENE F. ZENOBI, ESQ.
325 Almeria Avenue
Coral Gables, FL 33134
Telephone:  (305) 461-5444
Facsimile:   (305) 567-9356
Florida Bar No: 0130269

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.  00-6215-Cr-Dimitrouleas

UNITED STATES OF AMERICA,
                              Plaintiff,

v.

RICHARD SCRIVER,
                              Defendant.
_____/



## NOTICE OF OBJECTIONS TO PRESENTENCE INVESTIGATION
## REPORT AND REQUEST DOWNWARD DEPARTURES

COMES NOW, the Defendant, RICHARD SCRIVER, by and through his

undersigned counsel and respectfully moves for consideration of downward

departures pursuant to U.S.S.G. §5K2.0 or as otherwise noted and also notices

this Honorable Court pursuant to Rule 32, Fed.R.Crim.Proc., Rule 88.8, SD Fla.

L.R., and U.S.S.G. §6A1.3 of his formal objections to portions of the PSR with

respect to the following sections, pages, paragraphs and states:

### I.

### PSR OBJECTIONS

### A.     "Offense Conduct." PSR, p. 5 ¶8.

1.      The PSR purports to recite the background of the Defendant's one

and only (recorded) meeting with the CI at a cigar bar on Miami Beach. The PSR

unfairly describes that recorded conversation which serves as the predicate for

these charges.   The recorded conversation describes an extensive discussion



Exhibit "A"

about the purchase and sale of commercial real estate. Admittedly, there was some discussion about the sale of Ecstasy. The discussions concerning Ecstasy were minimal compared to the real estate based discussions. However, the paragraph is written in a manner to suggest an overwhelming discussion of Ecstasy, with minimal conversation concerning real estate. The converse is true.[1]

**B.    Role Assessment.  PSR, p. 6, ¶13.**

2.    The government requested and this Honorable Court found that Beeson deserved a minor role adjustment. The Defendant admits that he did provide Ecstasy to Beeson. However, in the same manner that the government suggests that Beeson occupied a "minor" role, i.e. as a result of steering the transaction to Scriver (an issue even incorporated within Beeson's Plea Agreement), Scriver merits the same and certainly not harsher treatment merely because he exercised his Sixth Amendment right to trial. This Defendant relies on the doctrine of the law of the case, the Fifth Amendment's equal protection component, the United States Sentencing Guidelines, and notions of "fundamental fairness" to equate his role to that of Beeson. Factually, Scriver was to Beeson what Beeson was to the CS. Merely because Beeson chose to cooperate with law enforcement, whereas the Defendant ultimately chose trial

---

[1] Given the fact that this Honorable Court tried this cause, this court may simply disclaim reliance upon the disputed facts since they may not impact the guideline and sentence calculations. Rule 32(c)(1), Fed.R.Crim.Proc. ("For each matter controverted, the court must

instead of cooperation,[2] is no reason that Beeson and this Defendant should be dissimilarly treated under the law for the limited purposes of role assessment. The government is vested with discretion to decide which individuals to prosecute, which offenses to charge, and what measure of punishment to seek. Cf. *United States v. Batchelder*, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.")  The government may not wield its prosecutorial power in an invidious or arbitrary manner.  However, this Court and not the prosecution, has exclusive jurisdiction in determining the application of the guidelines to any set of facts.  Role issue was and is for the court to decide; not the prosecutor.

3.    Here, the Defendant was not the ultimate supplier of the drugs.  In fact, this Defendant never supplied Ecstasy or any other drug to anyone  prior to Beeson reaching out with the prospect of a multi-million dollar real estate transaction.  Providing Ecstasy was just a tangent to the "deal" of overriding importance, the sale of a number of commercial real estate parcels.

How many times has this Honorable Court witnessed a drug transaction in which the criminal defendant expected no profit for the sale of the drugs and was only doing the drug transaction as an accommodation in order to consummate a

---

make this a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in or will not affect, sentencing.")

3

real estate deal after the Defendant was left impoverished by a divorce?  The Defendant respectfully invites this Honorable Court to make a role finding consistent with its finding in Beeson.

4.    The most recent pronouncement on role from the Eleventh Circuit provides this Honorable Court plenary discretion with which to make its findings. Cf. *United States v. DeVaron*, 175 F.3d 930, 938 (11th Cir.1999) (en banc ) (holding that determination of defendant's role in the offense is an ultimate finding of fact subject to the same clear error review as were the subsidiary facts on which it was based).

### C.    OFFENSE LEVEL COMPUTATION, PSR, p. 8

### 5.    Adjustment for Acceptance of Responsibility and Request for Safety Valve Consideration, PSR, p.8, ¶25

The Defendant respectfully invites this Court to provide a 2 level adjustment for acceptance of responsibility and a 2-level safety valve adjustment. This Circuit as well as the Third, Sixth, Seventh, Ninth, and Tenth Circuits have concluded that the entrapment defense and acceptance of responsibility reduction are compatible. See, *Joiner v. United States*, 103 F.3d 961, 963 (11th Cir.) ("[The defendant] would not have been barred as a matter of law from receiving an adjustment merely because he asserted an entrapment defense at trial, even though some courts have viewed the assertion of an entrapment

---

¹ As the Court is aware, this choice was driven by the Defendant's fervent desire to avoid

defense as the virtual antithesis of acceptance of responsibility. Rather, as with cases involving any other defense, whether a defendant has accepted responsibility is a fact-based question which requires the district court to carefully review all of the evidence bearing on a particular defendant's contrition.") (citation omitted), cert. denied, 520 U.S. 1246 (1997); *U.S. v. Demes*, 941 F.2d 220, 222 (3d Cir.1991) ("[I]t is conceivable to hypothesize a case in which a plea of entrapment would not be inconsistent with the acceptance of responsibility...."); *United States v. Fleener*, 900 F.2d 914, 918 (6th Cir.1990) ("[W]e find that the district court did not err in considering a reduction for acceptance of responsibility even though [the defendant] raised an entrapment defense at trial. Such a defense is no less inconsistent with the Guidelines provision than is a plea of not guilty, which does not raise an absolute bar to a court's consideration."); *United States v. Corral-Ibarra*, 25 F.3d 430, 440 (7th Cir.1994) (finding that an entrapment defense if pleaded in good faith "may possibly qualify" for a § 3E1.1 reduction, but in such a case "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct"); *United States v. Ing*, 70 F.3d 553, 556 (9th Cir.1995) ("The assertion of an entrapment defense is not necessarily incompatible with acceptance of responsibility."); *United States v. Davis*, 36 F.3d 1424, 1435 (9th Cir.1994); ("[T]he district court could not have found that [the defendant] had not accepted

---

deportation to Canada.

5

responsibility solely because he presented an entrapment defense at trial."); *U.S. v. Garcia*, 182 F.3d 1165, 1172 (10th Cir. 1999) (assertion of entrapment defense did not preclude downward adjustment for acceptance of responsibility).

The Defendant incorporates by reference his post arrest statements, post arrest cooperation and trial testimony. In addition to submitting to extensive debriefing, the Defendant, on multiple occasions, wore a wire-transmitting device or alternatively taped calls from his supplier or their "collection agents." The Defendant was threatened by his suppliers and, as requested by the DEA, he wore a transmitting device in order to record those conversations. Beyond that, prior to sentencing the Defendant provided a statement to the Probation Office accepting responsibility for his behavior leading to conviction.

The Defendant furthermore respectfully invites this court to review these statements in their entirety to determine whether it also merits safety valve consideration. At trial and before, the Defendant made startling admissions of serious misconduct, which serves as a factual basis for his conviction. Essentially, he took the witness stand and said, "I did it." However, he claimed that the law of entrapment provided a defense. Although the jury disagreed that the facts provided a "justification" defense, he did make extraordinarily incriminating admissions against his penal interests, which merits sentencing consideration under guideline sections 3E1.1 and 5C1.3. The Defendant did accept responsibility for his misconduct before, at trial, and thereafter.

6

asserted that it was three hundred kilograms. The district court accepted the government's position without making its own findings. The Eleventh Circuit ruled,

> The district court erred in deferring to the Government; the responsibility for determining the truthfulness of the information the defendant provided to the Government was the courts. See *United States v. White*, 119 F.3d 70, 73 (1st Cir. 1997); *United States v. Gambino*, 106 F.3d 1105, 1110 (2nd Cir. 1997); *United States v. Meduka*, 104 F.3d 891, 895 (6th Cir. 1997); *United States v. Thompson*, 81 F.3d 877, 880 (9th Cir. 1996).

*Espinosa*, 172 F.3d at 795.

Therefore, the Defendant respectfully moves this Honorable Court to grant sentencing consideration under U.S.S.G. §3E1.1 for acceptance of responsibility, as well as under 28 U.S.C. §3553(f)(5) and U.S.S.G. §5C1.3, commonly referred to as "safety valve."

## II.

## REQUEST FOR DOWNWARD DEPARTURE CONSIDERATION

### A.    Preface

The Probation Office recommends a Total Offense Level of 26, with a recommended guideline imprisonment range of 63-78 months. See PSR, p. 15, ¶62. Based upon the reasons set forth below, beyond his objections, the Defendant respectfully requests consideration of a downward departure.

8

**B.    This Court's Sentencing Hands Are Not Tied by the Base Offense Levels Under the Guidelines.**

Promulgation of the Sentencing Guidelines has placed certain stated limitations on the sentencing court's exercise of discretion, but the Guidelines have neither handcuffed the sentencing judge nor placed him or her in a straightjacket. See, e.g., Gerald B. Tjoflat, The Untapped Potential for Judicial Discretion Under the Federal Sentencing Guidelines: Advice for Counsel, 55 Federal Probation 4 (1991); William W. Wilkins, Jr., Plea Negotiations, Acceptance of Responsibility, Role of the Offender, and Departures: Policy Decisions in the Promulgation of Federal Sentencing Guidelines, 23 Wake Forest L.Rev. 181, 196 (1988) (departure power gives district judges flexibility to impose individualized sentences);   Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L.Rev. 635, 663 (1971) (Circuit courts must give do regard to "the superiority of [the district court's] nether position).

A sentencing court has the authority to impose a sentence outside the guideline range if it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that described." 18 U.S.C. §3553(b) (1994);  see also USSG §5K2.0 (1997) (policy statement explaining appropriate circumstances justifying departure under 18 U.S.C. §3553).  In *Koon v. United States*, the

9

Supreme Court clarified this aspect of the statute, holding that the unusual circumstances justifying the departure must take the case outside the "heartland" of cases contemplated by the applicable guidelines. See *Koon v. United States*, 518 U.S. 81, 94-96 (1996). If a factor is encouraged, see, e.g., §5K2.13 (Diminished Capacity), a court is authorized to depart from the applicable guideline if the guideline does not already take that factor into account. See *Koon*, 116 S.Ct. at 2045. If a factor is discouraged, see, e.g., §5H1.2 (education and vocational skills), or is an encouraged factor already taken into account by the applicable guideline, a district court may depart only if the factor is present to an exceptional degree or in some other way makes the case distinguishable from an ordinary case where the factor is present.

**1.    Imperfect Entrapment, §5K2.12**

A skillful prosecutor presented the government's case. The jury convicted this Defendant, notwithstanding a factually supported entrapment defense. Although the Eleventh Circuit has not yet ruled on the issue, many circuits have recognized that Section 5K2.12 was meant to apply precisely to those situations where a complete defense of entrapment was not present. Cf. U.S.S.G. §5K2.12 (Coercion and Duress as grounds for downward departure). That guideline notes,

> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence below the

10

applicable guideline range. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party....

U.S.S.G. §5K2.12, p.s.

No agent threatened the defendant. However, it was an extraordinarily skillful conman CI who initially proposed the illegal activity and held out the prospect of a One Million Dollar real estate commission in exchange for a relationship cemented by an Ecstasy transaction. At first, there was no mention of such a large quantity of pills. This sort of aggressive encouragement of wrongdoing, the utilization of such extraordinary sums of money placed before a recently divorced, psychologically devastated, and emotionally weakened non-drug offender, although not amounting to a complete defense, may be used as a basis for departure under Section 5K2.12.

Nearly the same facts, but with the use of an agent as the provocateur, served as the basis of an approved downward departure in *United States v. Garza-Juarez*, 992 F.2d 896 (9th Cir. 1993). Therefore, the imperfect entrapment defense serves as a basis for downward departure. See, *United States v. Amparo*, 961 F.2d 288, 292 (1st Cir.) (jury's rejection of duress defense does not preclude downward departure under section 5K2.12), *cert. denied sub nom.*

11

*Sanchez v. United States*, 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992); *United States v. Cheape*, 889 F.2d 477, 480 (3d Cir.1989) (vacating sentence when district court ruled that jury's rejection of coercion defense precluded downward departure under section 5K2.12); *United States v. Whitetail*, 956 F.2d 857, 863 (8th Cir.1992) (vacating sentence when district court ruled that jury's rejection of battered-woman defense precluded application of section 5K2.12); see also *United States v. Giles*, 768 F.Supp. 101, 103 (S.D.N.Y.) (granting downward departure based on "the manner in which [defendant] was set up for this crime by the Government's agent," even though jury rejected entrapment defense), *aff'd*, 953 F.2d 636 (2d Cir.1991) (table), *cert. denied*, 503 U.S. 949 (1992); *United States v. Nelson*, 740 F.Supp. 1502, 1516 (D.Kan.1990) (granting downward departure under section 5K2.12 based on coercion even though jury rejected coercion defense; citing *Cheape*).

The Ninth Circuit has recognized that a downward departure may be appropriate when government agents used persuasion alone, not threats. In *United States v. Takai*, 941 F.2d 738 (9th Cir.1991), the defendant participated in a scheme to bribe a government official. The district court granted a downward departure in part because:

> [t]he seriousness of defendants' participation is mitigated by the conduct of the government agent. While there was no allegation of entrapment, there was evidence at the sentencing hearing that Agent Goldman's conduct influenced defendants' decisions to continue playing a pivotal role.

12

*Id.* at 741. The Ninth Circuit affirmed the sentence, even though the agent's conduct "did not constitute entrapment in a legal sense." *Id.* at 744.

Most recently, the Second Circuit addressed the issue in *U.S. v. Bala* stating,

> "While to date we have not decided whether imperfect entrapment is proscribed by the guidelines as a ground for downward departure, we can find nothing in the guidelines to prohibit a district court from considering conduct by the government that does not give rise to an entrapment defense but that is nonetheless "aggressive encouragement of wrongdoing." Garza-Juarez, 992 F.2d at 912; see also *U. S. v. Giles*, 768 F.Supp. 101, 103-04 (S.D.N.Y.), aff'd without op., 953 F.2d 636 (2d Cir.1991). Moreover, the policy statement in Section 5K2.12 can reasonably be read to authorize such a departure in appropriate cases. Nevertheless, it is for the district courts to decide for themselves whether, in a particular case, a downward departure based on imperfect entrapment would remove that case from the "heartland of the applicable Guideline." See *United States v. Bonnet- Grullon*, 212 F.3d 692, 700 (2d Cir.2000) ("The determination of whether a case is within the heartland of the applicable guideline cannot be a matter of generalization.").

2000 WL 1877041, *3 (2nd Cir. (N.Y.))

This Court is faced with a similar situation. Based on the precedents discussed above, therefore, the imperfect entrapment defense does serve as a basis for downward departure.

13

### 2.    Diminished Capacity, U.S.S.G. 5K2.13

The Defendant merits consideration for a departure premised upon diminished capacity.[3] The Commission expressly encourages district courts to consider whether the defendant suffered from "significantly reduced mental capacity" at the time of the offense when deciding whether to grant a downward departure. See U.S. Sentencing Guidelines Manual § 5K2.13 (1998). The application note defines "significantly reduced mental capacity" to mean that the defendant "has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." Id. application n. 1. The amended section also provides that, "[i]f a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." Id. §5K2.13. See also, *U.S. v. Steele*, 178 F.3d 1230, 1240 (11th Cir. 1999)

### 3.    Extraordinary "Acceptance of Responsibility"

Undersigned counsel has researched the statistical compilations of the Sentencing Commission, which addresses both the percentile of downward departures granted and the subset percentile of the classification for those downward departures. "Acceptance of responsibility" (which we can assume is "extraordinary acceptance") is labeled as the reason for downward departures in

---

[1] The medical report has not been received by counsel. A copy will be submitted upon receipt.

14

a significant number of those cases.  See *1999 Source Book of Federal Statistics*, Table 25, Reasons Given by Sentencing Courts Upward and Downward Departures, "general mitigating circumstances", numbering 1254 constituting 13%; acceptance of responsibility, numbering 148, constituting 1.5%; *1998 Source Book of Federal Statistics*, Table 25, Reasons for Downward Departures, "general mitigating circumstances", numbering 1054, 14%; acceptance of responsibility, numbering 121, 1.6%.  See Exhibits A and B.

This Defendant confessed as soon as he was arrested.  He provided law enforcement with the identity of his drug supplier.  He provided the background facts concerning his criminal involvement.  He wore a wire while meeting with collections agents sent by his supplier.  He recorded threatening calls from his suppliers.  He worked with law enforcement agents as soon as he was arrested. He related his prior conspiratorial conversations with his co-defendant.  The Defendant provided the Drug Enforcement Administration with documents evidencing the identity of his supplier, provided law enforcement with a fixed location of their warehouse, and expressed remorse in very tangible terms.  He accepted responsibility in extraordinarily tangible terms.

15

4.   **Aberrant Behavior**

The new guideline states,

> §5K2.20. **Aberrant Behavior** (Policy Statement)
>
> A sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior. However, the court may not depart below the guideline range on this basis if (1) the offense involved serious bodily injury or death; (2) the defendant discharged a firearm or otherwise used a firearm or a dangerous weapon; (3) the instant offense of conviction is a serious drug trafficking offense; (4) the defendant has more than one criminal history point, as determined under Chapter Four (Criminal History and Criminal Livelihood); or (5) the defendant has a prior federal, or state, felony conviction, regardless of whether the conviction is countable under Chapter Four.

The Defendant respectfully invites this Honorable Court to find that Scriver's misconduct, in this case, amounts to aberrant behavior and constitutes an additional basis for downward departure consideration. In *United States v. Withrow*, 85 F.3d 527, 529 (11th Cir. 1996), the Eleventh Circuit concludes that the district court has discretion to depart downward from Sentencing Guidelines after making careful factual determination that defendant's offense conduct constituted single, aberrant act. "The aberrance of a criminal act is an encouraged factor for departure." *United States v. Talk*, 158 F.3d 1064, 1072 (10th Cir.1998), cert. denied, 525 U.S. 1164 (1999). The determination of whether an individual defendant's offense conduct is aberrational, like the

16

decision to depart, requires consideration of unique factors not readily susceptible of useful generalization. In *United States v. Withrow*, 85 F.3d 527, 529 (11th Cir. 1996), in a matter of first impression the Eleventh Circuit notes, "Here, the district court's decision to refuse *Withrow's* request for downward departure was based explicitly on the court's understanding that it lacked the discretion to consider such a request. In light of the court's unambiguous statement that it was not authorized to depart in this case, we conclude that the court's decision is reviewable. We therefore address whether the Sentencing Guidelines permit a downward departure based on the specific factor advanced by *Withrow*."

The Eleventh Circuit notes that U.S.S.G. Ch. 1, Pt. A, 4(d) provides a specific framework to which the court must refer in sentencing a first-time offender who likely would have received a probationary sentence under the pre-guidelines regime. Scriver meets this generalized qualification. The concluding sentence of the referenced section states that "**[t]he Commission, of course, has not dealt with the single acts of aberrant behavior that still may justify probation at higher offense levels through departures.**" *Id.* (Emphasis added). *Withrow* notes, "All circuits that have addressed and resolved the question posed by this appeal have concluded that single acts of aberrant behavior were excluded from consideration in the formulation of the guidelines and thus might justify sentences below the guideline range even in cases where

17

probation is not a viable option.  See, e.g., *United States v. Duerson*, 25 F.3d

376, 380 (6th Cir.1994)."

III.

### CORRECTED OFFENSE LEVEL COMPUTATION, PSR, P. 8 ¶¶18-26.

In conclusion, the Defendant respectfully invites this Honorable Court to

consider the following corrected PSR calculations:

PSR, ¶18, Base Offense Level:

| | |
|---|---|
| 289.6 of MDA kilograms of cocaine, §2D1.1(conversion table) | 26 |
| PSR, ¶21, Adjustment for Role in the Offense. | -2 |
| PSR ¶25 Adjustment for Acceptance of Responsibility. | -2 |
| PSR, ¶ Safety Valve. | -2 |
| PSR, ¶30 Total Offense Level. | 18 |
| PSR, ¶ Guideline Range. | 27-33 months |

**Departure Findings**

**Imperfect Entrapment,  §5K2.12**

**Diminished Capacity, U.S.S.G. §5K2.13**

**Extraordinary "Acceptance of Responsibility"**

**Aberrant Behavior**

**Departure Guideline Range    Zone C          12 - 16 months**

**Zone C allows intermediate sentencing sanctions.**

18

WHEREFORE, Defendant respectfully files these objections and prays that this Honorable Court enter an order finding that a downward departure is merited. The Defendant respectfully seeks findings that individually or as a consequence of a combination of these factors this is an unusual or atypical case such that this exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that described in the Guidelines.

Respectfully submitted,

Neil M. Schuster
407 Lincoln Road, Suite 11-B
Miami Beach, FL   33139
Telephone: (305) 673-3737

By: _____
Neil M. Schuster
Florida Bar No. 216909

Jeanne Baker, Esq.
2937 S.W. 27 Avenue, #202
Miami, Florida   33133
Office: 305-443-1600
Fl. Bar #: 880700

David Tucker, Esq.
2600 S. Douglas Road, Suite 1108
Coral Gables, Florida   33134-6143
Office: 305-461-3627

19

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed to Dana Washington, Assistant United States Attorney, Office of the United States Attorney, 500 East Broward Blvd., Ft. Lauderdale, Florida 33301 and Todd Eisinger, U.S. Probation Officer, Room 315, U.S. Courthouse, 300 N.E. First Avenue, Miami, Florida 33132-2126 this 22 day of February, 2001.

By:_____

Neil M. Schuster

20

Tables 24-25

## REASONS GIVEN BY SENTENCING COURTS FOR UPWARD AND DOWNWARD DEPARTURES
### Fiscal Year 1998

### Table 24

| REASONS FOR UPWARD DEPARTURES[1] | Number | Percent |
|---|---|---|
| Criminal history category does not reflect seriousness | 159 | 33.9 |
| Extreme conduct | 39 | 8.3 |
| Risk of future conduct based on prior conduct or record | 38 | 8.1 |
| General aggravating circumstances | 30 | 6.4 |
| Pursuant to plea agreement | 25 | 5.3 |
| Weapons/dangerous instrumentalities | 25 | 5.3 |
| Nature or seriousness of the offense | 14 | 3.0 |
| Extreme psychological injury | 13 | 2.8 |
| Criminal purpose | 13 | 2.8 |
| Physical injury | 12 | 2.6 |
| Dangerous or inhumane treatment | 10 | 2.1 |
| Death | 7 | 1.5 |
| Disruption of governmental function | 7 | 1.5 |
| Monetary value does not reflect extent of harm | 6 | 1.3 |
| Several persons injured | 5 | 1.1 |
| Further obstruction of justice | 5 | 1.1 |
| Guideline factors do not reflect offense seriousness | 4 | 0.9 |
| Outside applicable time period, but portion of income | 4 | 0.9 |
| Deportation | 4 | 0.9 |
| Child Abuse | 3 | 0.6 |
| Drug amount or drug purity | 3 | 0.6 |
| Public welfare | 2 | 0.4 |
| Other | 40 | 11.3 |

[1] Of the 50,754 cases, 391 were recorded as upward departures. Information on departure reasons was available in 377 of these cases which cited 469 reasons for upward departure. Courts often provided more than one reason for departure; consequently, the percentages across all reasons for departure may add up to more than 100 percent. The "Other" category includes all reasons provided less than two times among relevant cases.

### Table 25

| REASONS FOR DOWNWARD DEPARTURES[1] | Number | Percent |
|---|---|---|
| Deportation | 1,449 | 19.2 |
| Pursuant to plea agreement | 1,421 | 18.8 |
| General mitigating circumstances | 1,054 | 14.0 |
| Criminal history category does not reflect seriousness | 748 | 9.9 |
| Isolated incident/aberrant behavior | 598 | 7.9 |
| Family ties/responsibilities | 363 | 4.8 |
| Physical condition | 222 | 2.9 |
| Diminished capacity | 192 | 2.5 |
| Mental/emotional conditions | 131 | 1.7 |
| Not representative of the heartland | 131 | 1.7 |
| Acceptance of responsibility | 121 | 1.6 |
| Rehabilitation | 114 | 1.5 |
| Coercion and duress | 76 | 1.0 |
| Age | 75 | 1.0 |
| Mule/Role in the offense | 48 | 0.6 |
| Dollar amount | 42 | 0.6 |
| Cooperation (motion unknown) | 40 | 0.5 |
| Adequate to meet purposes of sentencing | 40 | 0.5 |
| Community ties | 36 | 0.5 |
| Voluntary disclosure (§5K2.16) | 36 | 0.5 |
| Sufficient punishment | 28 | 0.4 |
| Lesser harm | 20 | 0.3 |
| Other | 557 | 7.4 |

[1] Of the 50,754 cases, 6,509 were recorded as downward departures. Information on departure reasons was available in 6,273 of these cases which cited 7,543 reasons for downward departure. Courts often provided more than one reason for departure; consequently, the percentages across all reasons for departure may add up to more than 100 percent. The "Other" category includes all reasons provided less than 20 times among relevant cases. Cases in which substantial assistance was given as a reason for a downward departure were not included in this table. Description of variables used in this table are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 1998 Datafile, USSCFY98.

EXHIBIT A

## Tables 24-25
## REASONS GIVEN BY SENTENCING COURTS FOR UPWARD AND DOWNWARD DEPARTURES
### Fiscal Year 1999

### Table 24

| REASONS FOR UPWARD DEPARTURES[1] | Number | Percent |
|---|---|---|
| Criminal history category does not reflect seriousness | 126 | 32.6 |
| Extreme conduct | 39 | 10.1 |
| Risk of future conduct based on prior conduct or record | 33 | 8.5 |
| Extreme psychological injury | 23 | 6.0 |
| General aggravating circumstances | 19 | 4.9 |
| Pursuant to plea agreement | 14 | 3.6 |
| Nature or seriousness of the offense | 12 | 3.1 |
| Physical injury | 10 | 2.6 |
| Criminal purpose | 7 | 1.8 |
| Death | 6 | 1.6 |
| Several persons injured | 5 | 1.3 |
| Large number of aliens | 4 | 1.0 |
| Guideline factors do not reflect offense seriousness | 4 | 1.0 |
| Weapons/dangerous instrumentalities | 4 | 1.0 |
| Disruption of governmental function | 4 | 1.0 |
| Monetary value does not reflect extent of harm | 4 | 1.0 |
| Public welfare | 3 | 0.8 |
| Further obstruction of justice | 3 | 0.8 |
| Property damage or loss | 3 | 0.8 |
| Drug amount or drug purity | 2 | 0.5 |
| Negligence involved | 2 | 0.5 |
| Child abuse | 2 | 0.5 |
| Deportation | 2 | 0.5 |
| Other | 55 | 14.2 |

### Table 25

| REASONS FOR DOWNWARD DEPARTURES[2] | Number | Percent |
|---|---|---|
| Pursuant to plea agreement | 1,619 | 16.7 |
| General mitigating circumstances | 1,254 | 13.0 |
| Criminal history overrepresents defendant's involvement | 1,018 | 10.5 |
| Fast track | 936 | 9.7 |
| Deportation | 849 | 8.8 |
| Offense behavior was an isolated incident | 818 | 8.4 |
| Family ties and responsibilities | 492 | 5.1 |
| Physical condition | 274 | 2.8 |
| Diminished capacity | 265 | 2.7 |
| Rehabilitation | 194 | 2.0 |
| Not representative of the heartland | 193 | 2.0 |
| Acceptance of responsibility | 148 | 1.5 |
| Mental and emotional conditions | 117 | 1.2 |
| Age | 101 | 1.0 |
| Coercion and duress | 79 | 0.8 |
| Mule/role in the offense | 74 | 0.8 |
| Adequate to meet purposes of sentencing | 58 | 0.6 |
| Cooperation (motion unknown) | 44 | 0.5 |
| Drug dependence/alcohol abuse | 37 | 0.4 |
| Time served | 37 | 0.4 |
| Voluntary disclosure (§5K2.16) | 35 | 0.4 |
| Community ties | 33 | 0.3 |
| Dollar amount | 33 | 0.3 |
| Sufficient punishment | 29 | 0.3 |
| Victim's conduct | 27 | 0.3 |
| Deterrence | 26 | 0.3 |
| Previous employment record | 22 | 0.2 |
| Lesser harm | 21 | 0.2 |
| Restitution | 20 | 0.2 |
| Other | 836 | 8.6 |

[1] Of the 55,557 cases, 313 were recorded as upward departures. Information on departure reasons was available in 308 of these cases which cited 386 reasons for upward departure. The "Other" category includes all reasons provided fewer than two times among relevant cases.

[2] Of the 55,557 cases, 8,304 were recorded as downward departures. Information on departure reasons was available in 8,119 of these cases which cited 9,633 reasons for downward departure. Counts often provided more than one reason for departure; consequently, the percentages across all reasons for departure may add up to more than 100 percent. The "Other" category includes all reasons provided fewer than 20 times among relevant cases. Cases in which substantial assistance was given as a reason for a downward departure were not included in this table. Descriptions of variables used in these tables are provided in Appendix A.

EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

RICHARD SCRIVER,

    Defendant.

CASE NO. 00-6215-CR-DIMITROULEAS

**VERDICT**

FILED by _____ D.C.

NOV 3 0 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

WE, THE JURY, FIND: the Defendant RICHARD SCRIVER,

**As to Count I**      *Guilty As Charged*
GUILTY AS CHARGED // GUILTY-LESSER // NOT GUILTY

**As to Count II**     *Guilty As Charged*
GUILTY AS CHARGED // GUILTY-LESSER // NOT GUILTY

as charged in the Indictment.

So say we all.

_Anthony Catapano_
FOREPERSON

_11/30/00_
DATE



57

Cook - Cross

1      THE COURT: Okay.

2      (Pause.)

3   A.  Okay.  You are correct.  100,000 units of MDMA.

4   Q.  And that is another inaccuracy, is that correct, ma'am?

5   A.  It's not an inaccuracy as to the report.  This is what I

6   was told at the time, and that's what I wrote down.  So it's

7   not inaccurate.  Things change as we negotiate and things

8   actually happen.

9   Q.  I am sorry.  My question was:  It was an inaccuracy in

10  your testimony when you said your report said 100,000?  It

11  really said fifty?

12  A.  This report says fifty.

13  Q.  And you just testified earlier that it said a hundred, is

14  that correct?

15  A.  I believe that I had written down 100,000, yes.

16  Q.  It's just a mistake, is that correct?

17  A.  Uh-huh.

18  Q.  Did you make any other inaccuracies or mistakes in your

19  reports, ma'am?

20  A.  Looking at this report I can see that I made a

21  typographical error, and I noticed I typed in MDNA and that is

22  inaccurate.  It is MDMA, which is what we had intended to

23  purchase.

24  Q.  Going beyond that report, ma'am, after your Case

25  Initiation report, did you make any other inaccuracies in your

Exhibit "B"

58

Cook - Cross

1   reports?

2   A.  Not intentionally.

3   Q.  You recall that you did a report -- you talked about how

4   you played the tapes for Bruce Lyons?  Do you recall that?

5   A.  Yes, we played some of them.

6   Q.  And Bruce Lyons is the attorney for James Beeson?

7   A.  Yes.

8   Q.  And Mr. Beeson is the witness who is testifying against

9   Mr. Scriver, is that correct?

10  A.  Yes.  He testified yesterday.

11  Q.  And in August of 2000 is it a fair statement that the case

12  had been going on for about four months?

13  A.  Three months.

14  Q.  Three months.

15       You recall that you did a report, and in the report

16  you called Bruce Lyons defense attorney Paul Lyons?

17  A.  Yes.  I don't recall that, but you just read it, so I have

18  no reason to disagree with you.

19  Q.  That was a mistake, just changing the name of Bruce to

20  Paul, is that correct?

21  A.  Yes.

22  Q.  And you tried to be as accurate in the recording of the

23  statement from Mr. Scriver as you were in all of these other

24  reports, is that correct, ma'am?

25  A.  From my notes, yes.

61

Cook - Cross

1    Q.  Is Ecstasy MDMA based upon your experience?  Do you have

2    enough -- strike that -- do you have enough knowledge to

3    testify whether Ecstasy is MDMA?

4    A.  Yes.  That is one of the chemicals, yes.

5    Q.  One of the chemicals?

6    A.  Ecstasy is a street name, sir.  It's a street name.  There

7    is -- you can have heroin and MDMA or MDMA and Ecstasy.  You

8    can have Meth and no Meth in Ecstasy.   Ecstasy is like an

9    umbrella name for many different chemicals.

10   Q.  Is it a fair statement, ma'am, that in law enforcement

11   when you are discussing Ecstasy, you were referring to MDMA?

12   A.  I was referring to a controlled substance.

13   Q.  And in your reports, ma'am, you put MDMA, did you not?

14   A.  Yes, I did.

15   Q.  Throughout the course of your reports you put MDMA, did

16   you not, ma'am?

17   A.  Yes, I believe I did up until the lab report.

18   Q.  And based upon your understanding of this case, the

19   chemical, the drug which was supposed to be purchased by

20   Mr. Tinley, was MDMA, is that correct, ma'am?

21   A.  Or Ecstasy, yes.

22   Q.  But the drug that was ultimately purchased was MDA

23   (phonetic), is that correct, ma'am?

24   A.  Yes.

25        MR. TUCKER:  May I have a minute, Your Honor?

62

Cook - Cross

1       THE COURT:  Okay.

2       MR. TUCKER:  Your Honor, thank you very much.  I

3  tender the witness.

4       THE COURT:  All right, members of the jury, we are

5  going to take a ten-minute recess.

6       Remember my admonition not to discuss the case or

7  allow it to be discussed in your presence.

8       And we will see you back in the jury room in ten

9  minutes.

10      (Jury out at 10:56 a.m.)

11      THE COURT:  And, again, Officer Cook, during the

12  break in your testimony you are not allowed to discuss your

13  testimony with anyone.

14      Do you understand?

15      THE WITNESS:  Yes.

16      THE COURT:  Just a point of inquiry, Mr. Tucker.  Did

17  you have 14 copies of the transcript to hand out to the jury if

18  I would have allowed that?

19      MR. TUCKER:  Yes.

20      MS. BAKER:  I think we have 18 copies so Your Honor

21  could have one.  And we have already given to the Government,

22  but I think we made a couple of extras.

23      THE COURT:  It's such a poor transcript, I don't know

24  that -- it's such a poor tape, I don't know that the transcript

25  was helpful.

AO 91 (Rev. 5/85) Criminal Complaint    AUS. EDWARD R. RYAN DEA S/A NANCY COOK

# United States District Court

_____SOUTHERN_____    DISTRICT OF    _____FLORIDA_____

UNITED STATES OF AMERICA

V.                                      **CRIMINAL COMPLAINT**

JAMES BLAKE BEESON, JR.
RICHARD SCRIVER (c.3)          CASE NUMBER: OO-4118-JACOO

FILED by ___ D.C.

MAY 22 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

(name and address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  On or about _May 19, 2000_, in ___Broward__ county, in the ___Southern___ District of _Florida_ defendant(s) did, (Track Statutory Language of Offense)

possession with intent to distribute methylenedioxymethamphetamine (MDMA);

in violation of Title __21__ United States Code, Section(s) _841(a)(1)_

I further state that I am a(n) _DEA Special Agent_ and that this complaint is based on the following
                                   Official Title
facts:

Please see attached affidavit.

Continued on the attached and made a part hereof:    [x] Yes   [ ] No

_Signature of Complainant_
Nancy M. Cook, Special Agent
Drug Enforcement Administration

Sworn to before me, and subscribed in my presence,

**May 22, 2000**                at  _Fort Lauderdale, Florida_
Date                                  City and State

UNITED STATES MAGISTRATE JUDGE      _Signature of Judicial Officer_
Name and Title of Judicial Officer

_Composite Exhibit "C-1"_

AFFIDAVIT OF TASK FORCE OFFICER NANCY COOK

I, Nancy M. Cook, having been duly sworn, do hereby state that I am a Task Force Officer with the Drug Enforcement Agency (DEA) stationed in Ft. Lauderdale, Florida.

1.    During my thirteen years in law enforcement, I have participated in the investigations of individuals who have violated the narcotics laws of the United States. Over this thirteen year period, I have been involved in the arrest of several hundred individuals for violations of the State and Federal narcotics statutes. Based upon my training, experience and participation in the investigations of the distribution of narcotics in the United States, and in this investigation, I believe that there is probable cause to believe that the individual named in the attached Complaint have violated the narcotics laws of the United States. The basis of my probable cause is as follows.

2.    On May 19, 2000, this Task Force Officer met with a confidential source (CS) who informed this Officer that James Blake BEESON, Jr was supplying quantities of Ecstasy in the Atlanta, Georgia area. Further investigation revealed that BEESON resided at 2070 NE 63 Street, Ft Lauderdale, Florida, and had a source of supply believed to be in the Fort Lauderdale/Miami area. The CS revealed to this Officer that the CS has known BEESON for at least eleven years, and that he had purchased both Ecstasy and Cocaine from BEESON in the past three months.

3.    Based on this information and at DEA's direction, the CS placed a series of consensually monitored and recorded telephone calls beginning on May 16, 2000 and continuing through May 20, 2000. During those conversations, the CS and BEESON arranged to meet on May 19, 2000 in Ft. Lauderdale at which time the CS would arrange for the delivery of 100,000 hits of Ecstasy at a negotiated price of $450,000. (Numerous recorded conversations were made leading up to the May 19, 2000 meeting between the CS and BEESON.) I am not reciting every fact

-1-

regarding this investigation. but only the ones which I deem necessary and important to provide probable cause.

4.    On May 19, 2000, the CS. under the direction of DEA. met with BEESON at a restaurant to finalize the transaction scheduled to take place the morning of May 20, 2000. Initially the arrangements were made to purchase 100,000 hits of Ecstasy and 62 kilograms of Cocaine BEESON indicated at that meeting the inability to procure 62 kilograms of Cocaine, but indicated that the 100,000 hits of Ecstasy were readily available On the morning of May 20, 2000 the CS. at the direction of DEA, met with BEESON at his residence and then traveled with BEESON to the Executive Condominium. located at 4925 Collins Avenue, Miami Beach, Florida. Upon arrival the CS and BEESON met Richard SCRIVER. the source of the Ecstasy. The three individuals traveled to a local Cigar Bar where they sat in a private room discussing the 100,000 hit Ecstasy transaction. the possibility of future cocaine transactions, and the laundering of U.S Currency The three were then surveilled back to SCRIVER's condominium where SCRIVER was observed handing a brown bag to BEESON, later identified as containing 2.5 kilograms of Ecstasy, approximately 100,000 hits BEESON in turn placed the bag in the rear seat of the CS's vehicle. Both BEESON and the CS proceeded northbound on I-95 whiled followed by SCRIVER. Consensually monitored conversations between the CS, BEESON, and SCRIVER indicated that SCRIVER would follow BEESON to his Ft Lauderdale residence where they would await a money source to purchase the 100,000 hits of Ecstasy

5    While Northbound on I-95, DEA along with the assistance of Florida Highway Patrol, conducted a felony traffic stop on SCRIVER's vehicle at which time he was placed in custody

-2-

Moments later, a felony traffic stop was conducted on the CS's vehicle by DEA and the Broward Sheriff's Office, at which time BEESON was placed into custody

6    Based upon the facts and circumstances described above, I believe there exists probable cause that James Blake BEESON and Richard SCRIVER violated the narcotics laws of the United States.

FURTHER AFFIANT SAYETH NOT

Nancy M. Cook, Special Agent
Drug Enforcemnt Administration

Subscribed and sworn to
before me this 22 day
of May, 2000.

UNITED STATES MAGISTRATE

-3-

ERR:km

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **00-6158** CR-DIMITROULEAS

21 USC §846·
21 USC §841(a)(1)
18 USC §2

MAGISTRATE JUDGE
SNOW

UNITED STATES OF AMERICA, )
)
                Plaintiff, )
vs.                        )
                           )
JAMES BLAKE BEESON,        )
                           )
                Defendant. )
_____ )

## INDICTMENT

The Grand Jury charges that:

### COUNT I

From on or about May 15, 2000 through on or about May 19, 2000, at Broward County, in the Southern District of Florida, the defendant,

JAMES BLAKE BEESON,

did knowingly and intentionally combine, conspire, confederate and agree with persons known and unknown to the Grand Jury to possess with intent to distribute a Schedule I controlled substance, that is, a mixture and substance containing a detectable amount of

EXHIBIT C-2

methylenedioxymethamphetamine (MDMA), in violation of Title 21,
United States Code, Section 841 (a)(1), all in violation of Title
21, United States Code, Section 846.

## COUNT II

On or about May 19, 2000, at Broward County, in the Southern
District of Florida, the defendant,

JAMES BLAKE BEESON,

did knowingly and intentionally possess with intent to distribute
a Schedule I controlled substance, that is, a mixture and
substance containing a detectable amount of
methylenedioxymethamphetamine (MDMA); in violation of Title 21,
United States Code, Section 841(a)(1), and Title 18, United
States Code, Section 2.

A TRUE BILL

_____

FOREPERSON

_____
GUY A. LEWIS
UNITED STATES ATTORNEY

_____
EDWARD R. RYAN
ASSISTANT UNITED STATES ATTORNEY

2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA            CASE NO. _____

v.                          )

**CERTIFICATE OF TRIAL ATTORNEY***

JAMES BLAKE BEESON _____       **Superseding Case Information:**
Court Division: (Select One)          New Defendant(s)        Yes ____    No ____
                                       Number of New Defendants     ____
___ Miami   ___ Key West              Total number of counts       ____
_X_ FTL ___ WPB ___ FTP

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the Information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:        (Yes or No) _____ NO_____
    List language and/or dialect _____ English_____

4.  This case will take __3__ days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

| | (Check only one) | | | (Check only one) | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _X_ | Petty | | ____ |
| II | 6 to 10 days | ____ | Minor | | ____ |
| III | 11 to 20 days | ____ | Misdem. | | ____ |
| IV | 21 to 60 days | ____ | Felony | | _X_ |
| V | 61 days and over | ____ | | | |

6.  Has this case been previously filed in this District Court? (Yes or No) _No_
    If yes:
    Judge: _____    Case No. _____
    (Attach copy of dispositive order)

    Has a complaint been filed in this matter?      (Yes or No) _Yes_
    If yes:
    Magistrate Case No. _00-4118 SNOW_____
    Related Miscellaneous numbers:_____
    Defendant(s) in federal custody as of _No_____
    Defendant(s) in state custody as of _____
    Rule 20 from the_____ District of _____
    Is this a potential death penalty case? (Yes or No) ___No___

7.  Does this case originate from a matter pending in the U. S. Attorney's Office prior to April 1, 1999? ___ Yes _x_ No    If yes, was it pending in the Central Region? ___ Yes _x_ No

                                       EDWARD . RYAN
                                       ASSISTANT UNITED STATES ATTORNEY
                                       Florida Bar No. A500053

*Penalty Sheet(s) attached                              REV.4/7/99

AO 190 (9/91)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,          CASE NO. 00-6158-CR-WPD

    Plaintiff,

vs.

JAMES BLAKE BEESON,

    Defendant.
_____/

## OBJECTIONS TO THE PRESENTENCE INVESTIGATION

COMES NOW the Defendant, JAMES BLAKE BEESON, by and through his undersigned counsel and files this his Objection to the Presentence Investigation Report as submitted by the Probation Department and would state as follows:

A) The Defendant objects to the description of the offense conduct in this report. The Assistant United States Attorney, Edward Ryan, had informed counsel that he would not call James Tinley, the CS in this matter, and after an investigation of his background, this is not surprising. Mr. Tinley, having previously been charged with escape, robbery, and violations of probation, and other offenses, initially provided information about James Blake Beeson at or about the time he was re-arrested for a violation of probation.

Research on this career criminal reveals that several of the crimes that Tinley was involved with in Georgia were of the "scam" type. The Defendant denies selling drugs to the confidential informant although he concedes that when he was in Atlanta for a meeting, both he and the informant ingested controlled substances.

Exhibit C-3

unlimited financial resources.  Beeson sees this as an opportunity to extricate himself from serious debt, while at the same time attempting to show his father that he can solve the families' financial problems.

      C) With regard to paragraph 9, all of the drug discussion is a predicate to the real estate

two individuals together. The business characterized by Scriver as a pyramid business is in fact known as Excel Communications which sells telecommunications equipment and beepers.

E) The Defendant would object to paragraphs 13 and 18 as to the base offense level calculated by the Probation Department. It is the position of the Defendant that this level should be 22 rather than level 24 as set out in paragraph 18. The Defendant has contacted Dr. Terry Hall of Forensic Toxicology Associates who was asked to review and evaluate the evidence currently held by the DEA as represented by the lab reports provided by the Government. Dr. Hall has indicated as follows:

The DEA Lab Report No. 113413 has been reviewed. The controlled substance currently held in DEA Lab #113413 is 2272.9 grams (reserve amounts 1916.7g and 356.2g) Using the drug equivalency table in §201.1, 2272.9g of MDMA would equate to 79.55 kilograms of marijuana. The government removed about 6.28 grams of the evidence and gave it away. Without the amount which they gave away, the total amount converts to 79.916 kilograms of marijuana. An additional amount was also destroyed intentionally after testing was complete.

By stipulation, the parties have agreed to level 22, rather than deal with the potential error factor of the four grams which would place the amount within the level 22 range. Any efforts to reconstruct would be to no avail since in each of the packages quantities of pills have been altered. Additionally, any moisture added to the pills prior to their being weighed would provide additional weight creating a potential for inaccurate weight. Given the small numbers and the high potential for error, the parties conceded level 22 as the most appropriate.

F) The Defendant objects as to role in paragraph 20 of the Presentence Report. Beeson was merely in a position of introducing the buyer to the eventual seller, named Scriver, and was

to receive no remuneration whatsoever for the transaction.  Pursuant to U.S. Sentencing Guidelines Manual §3B1.2(b), the Defendant should be accorded a two level decrease for his minor role so as to delineate and differentiate his participation from the other individuals involved in this transaction.  The Assistant United State Attorney assigned to this matter after careful evaluation and review, has agreed and stipulated to recommend that this Court sentence the Defendant and give him a two level reduction for his minor participation.  This Defendant merely put together an individual looking to purchase drugs with an individual who was selling drugs.  He never had the ability to exercise control over the important details of this transaction.  He received no share of the proceeds of the sale, and his primary interest was in getting these players together for other reasons.  The Defendant's conduct is linked to the instant offense in the following ways:

(1) At the time of the commission of the instant offense, the Defendant was going through an emotional divorce with his wife, facing the prospect of his two children moving to Atlanta, Georgia, after the sale of the marital residence.

(2) That both the Defendant and his father had declared bankruptcy and were in financial difficulties resulting in the potential of foreclosure on the marital residence.

(3) The Defendant had a long standing significant drug problem dating back to 1983 which was confirmed by both Doctors, Caddy (in 1984), Kosches (in 1994) and lastly, by Dr. Michael Brannon, (in August of 2000).  This is further confirmed by the fact that although all of his pre-trial urine drops were satisfactory, he had one dirty urine resulting in a modification of his pre-trial release conditions and requiring him to attend a drug program.  Mr. Beeson was particularly vulnerable to the persuasiveness of the confidential source, James Tinley, in this

matter, who usually started out conversations talking about real estate transactions, and ending up discussing the purchase of drugs. For illustrative purposes, one of the tapes that would have been used had this case proceeded to trial, is of a conversation between the Defendant and the confidential source, James Tinley, over the telephone discussing various subjects. Once Beeson hangs up the telephone, for some reason the tape continues monitoring the conversation revealing conversations between the confidential source and government agents. The confidential source seems to brag about how he supposedly reeled Mr. Beeson in, while at the same time bragging that he used to be a car salesman. In this instance the source was successful in reeling Mr. Beeson in, while using a real estate deal as bait.

G) For the reasons discussed within, the Court should adopt the Stipulation entered into by the Government with the Defendant. It is both appropriate and supportable by the facts.

H) Paragraph 23 should then be level 20 as opposed to level 24 as reflected in the Presentence Report.

I ) The Defendant would object to paragraph 27 which should then reflect a reduction to level 17 based upon the reasoning set forth in the above paragraphs.

J) The Defendant objects to paragraph 77 which should reflect guideline imprisonment range level 17 from 27 to 33 months.

K ) The Defendant would object to paragraph 83 since the fine range should be between $5,000.00 to $1,000,000.00.

L) The Defendant would object to paragraph 35 since the Court should consider a downward departure pursuant to § 4A1.3, of the U.S. Sentencing Guidelines since the Defendant's prior criminal record may be overstated. The Defendants prior convictions in one

form or another relate to his drug and alcohol problems.  With the treatment for drugs and alcohol, the help he will receive while he is in prison, the likelihood of recidivism will be significantly reduced.  It is therefore respectively submitted that the Court should consider a downward departure.

**WHEREFORE**, Defendant having filed this his Objections to the Presentence Investigation Report, respectfully requests the Probation Department to make the requisite changes to reflect same as being in conflict.

I HEREBY CERTIFY that a true copy of the foregoing was furnished by mail  this 3rd day of November, 2000, to AUSA EDWARD RYAN, Office of the United States Attorney, 500 East Broward Boulevard, 2nd Floor, Fort Lauderdale, Florida 33301; and by hand delivery to DIETRA PRATT, United States Probation Officer, United States Courthouse, 299 East Broward Blvd., Suite 409, Fort Lauderdale, FL 33301.

LYONS AND SANDERS CHARTERED
Counsel for Defendant
600 Northeast Third Avenue
Fort Lauderdale, FL  33301
Telephone: (954)467-8700
Telecopier: (954)763-4856
brucelyons@aol.com (Email)

BY
BRUCE M. LYONS, ESQUIRE
FLORIDA BAR NO. 104975

AO 245B (Rev 8/96) Sheet 1 - Judgment in a Criminal Case

# United States District Court

## Southern District of Florida

UNITED STATES OF AMERICA

v.

**JAMES BLAKE BEESON**

**JUDGMENT IN A CRIMINAL CASE**

(For Offenses Committed On or After November 1, 1987)

Case Number:  **0:00CR06158-001**

Bruce Lyons, Esq./Edward Ryan, AUSA

Defendant's Attorney

### THE DEFENDANT:

☒ pleaded guilty to count(s)  1

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute Methylenedioxymethamphetamine (MDMA) | 05/19/2000 | 1 |

FILED by _____ D.C.

NOV 27 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

The defendant is sentenced as provided in pages 2 through __8__ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☒ Count(s) 2 _____ is dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec. No.: **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**

Defendant's Date of Birth: **02/07/1964**

Defendant's USM No.: **55312-004**

Defendant's Residence Address:

**2070 NE 63rd Street**

| **Fort Lauderdale** | **FL** | **33308** |

Defendant's Mailing Address:

**Federal Detention Center**

**33 NE 4th Street**

| **Miami** | **FL** | **33132** |

**11/24/2000**

Date of Imposition of Judgment

Signature of Judicial Officer

**WILLIAM P. DIMITROULEAS**

**UNITED STATES DISTRICT JUDGE**

Name & Title of Judicial Officer

November 27, 2000

Date

Exhibit C-4

AO 245B (Rev. 8/96) Sheet 2 - Imprisonment

Judgment-Page ___2___ of ___8___

DEFENDANT:    **JAMES BLAKE BEESON**
CASE NUMBER:    0:00CR06158-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of ___27___ month(s) _____ .

☒ The court makes the following recommendations to the Bureau of Prisons:

*That the defendant receive drug treatment while in prison.*

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ a.m./p.m. on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
Deputy U.S. Marshal

AO 245B (Rev. 8/96) Sheet 3 - Supervised Release

DEFENDANT:    **JAMES BLAKE BEESON**
CASE NUMBER:    **0:00CR06158-001**

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of ___3___ **year(s)** .

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

   The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.

   ☐ The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☒ The defendant shall not possess a firearm as defined in 18 U.S.C. § 921. (Check, if applicable.)

   *If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.*

   The defendant shall comply with the standard conditions that have been adopted by this court (set forth below) . The defendant shall also comply with the additional conditions on the attached page (if indicated below).
See Special Conditions of Supervision - Page    4

# STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 8/96) Sheet 3 - Supervised Rele.

Judgment-Page   4   of   8

DEFENDANT:        JAMES BLAKE BEESON
CASE NUMBER:      0:00CR06158-001

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall participate in an approved treatment program for substance abuse as directed by the U.S. Probation Officer. Participation may include inpatient/outpatient treatment, if deemed necessary. The defendant will contribute to the costs of services rendered (copayment) in an amount determined by the probation officer, based on ability to pay or availability of third party payment.

The defendant shall not incur any further debt, including but not limited to loans, lines of credit or credit card charges, either as a principal or cosigner, as an individual or through any corporate entity, without first obtaining permission for the U.S. Probation Officer.

AO-245B (Rev. 8/96) Sheet 5, Part A - Criminal Penalties

Judgment-Page __5__ of __8__

DEFENDANT:       **JAMES BLAKE BEESON**

CASE NUMBER:     **0:00CR06158-001**

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **Totals:** | $        100.00 | $ | $ |

☐ If applicable, restitution amount ordered pursuant to plea agreement . . . . . . . . . . . .   $ _____ ___

## FINE

The above fine includes costs of incarceration and/or supervision in the amount of $ _____ .

The defendant shall pay interest on any fine of more than $2,500, unless the fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ The interest requirement is waived.

    ☐ The interest requirement is modified as follows:

## RESTITUTION

☐ The determination of restitution is deferred until _____ . An Amended Judgment in a Criminal Case will be entered after such a determination.

☐ The defendant shall make restitution to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below.

| **Name of Payee** | * **Total Amount of Loss** | **Amount of Restitution Ordered** | **Priority Order or Percentage of Payment** |
|---|---|---|---|
|  |  |  |  |

Totals:   $ _____   $ _____

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994 but before April 23, 1996.

AO 245B (Rev 8/96) Sheet 5, Part B - Criminal Monetary Penalties

Judgment-Page __6__ of __8__

DEFENDANT:       **JAMES BLAKE BEESON**
CASE NUMBER:     0:00CR06158-001

## SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment; (2) restitution; (3) fine principal; (4) cost of prosecution; (5) interest; (6) penalties.

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A ☒ in full immediately; or

B ☐ $ _____ immediately, balance due (in accordance with C, D, or E); or

C ☐ not later than _____ ; or

D ☐ in installments to commence _____ day(s) after the date of this judgment. In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision, the U.S. probation officer shall pursue collection of the amount due, and shall request the court to establish a payment schedule if appropriate; or

E ☐ in _____ (e.g. equal, weekly, monthly, quarterly) installments of $ _____ over a period of _____ year(s) to commence _____ day(s) after the date of this judgment.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Special instructions regarding the payment of criminal monetary penalties:

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalty payments, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program are to be made as directed by the court, the probation officer, or the United States attorney.

AO 245B (Rev. 8/96) Sheet 6 - Statement of Reasons

DEFENDANT:    **JAMES BLAKE BEESON**
CASE NUMBER:    **0:00CR06158-001**

# STATEMENT OF REASONS

☐ The court adopts the factual findings and guideline application in the presentence report.

## OR

☒ The court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary):
   **See Additional Factual Findings and Guideline Application Exceptions - Page   8**

**Guideline Range Determined by the Court:**

Total Offense Level:    17

Criminal History Category:    **II**

Imprisonment Range:    **27 to 33 months**

Supervised Release Range:    **3 years**

Fine Range:  $ ____5,000.00____ to $ __1,000,000.00__

   ☒ Fine waived or below the guideline range because of inability to pay.

Total Amount of Restitution:  $  _____

   ☐ Restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U.S.C. § 3663(d).

   ☐ For offenses committed on or after September 13, 1994 but before April 23, 1996 that require the total amount of loss to be stated, pursuant to Chapters 109A, 110, 110A, and 113A of Title 18, restitution is not ordered because the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of a restitution order in the forseeable future under any reasonable schedule of payments.

   ☐ Partial restitution is ordered for the following reason(s):

   ☒ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.

## OR

   ☐ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s):

## OR

   ☐ The sentence departs from the guideline range:

      ☐ upon motion of the government, as a result of defendant's substantial assistance.

      ☐ for the following specific reason(s):

AO 245B (Rev. 8/96) Sheet 6 - Statement of Reasons

Judgment-Page __8__ of __8__

DEFENDANT:      JAMES BLAKE BEESON

CASE NUMBER:      0:00CR06158-001

## ADDITIONAL FINDINGS AND GUIDELINE APPLICATIONS EXCEPTIONS

The base offense level pursuant to section 2D1.1 is a level 22 as the offense involved at least 60 kilograms but less than 80 kilograms. The court found the defendant to be a minor participant pursuant to 3B1.2(b). The Court found the defendant has accepted responsibility pursuant to 3E1.1

ERR Lm

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 00-6215-CR-DIMITROULEAS(S)

21 USC §846
21 USC §841(a)(1)
18 USC §2



FILED by _____ D.C.

SEP 7 2000

CLENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

UNITED STATES OF AMERICA, )
                                   )
                Plaintiff, )
vs.                             )
                                   )
RICHARD SCRIVER,          )
                Defendant. )
_____ )

### SUPERSEDING INDICTMENT

The Grand Jury charges that:

### COUNT I

From on or about May 15, 2000 through on or about May 20, 2000, at Broward County,

in the Southern District of Florida, the defendant,

### RICHARD SCRIVER,

did knowingly and intentionally combine, conspire, confederate and agree with persons known

and unknown to the Grand Jury, to possess with intent to distribute a Schedule I controlled

substance, that is, a mixture and substance containing a detectable amount of



Composite Exhibit "D-1"

methylenedioxymethamphetamine (MDMA), in violation of Title 21, United States Code,

Section 841 (a)(1), all in violation of Title 21, United States Code, Section 846.

COUNT II

On or about May 19, 2000, at Broward County, in the Southern District of Florida, the

defendant,

RICHARD SCRIVER,

did knowingly and intentionally possess with intent to distribute a Schedule I controlled

substance, that is, a mixture and substance containing a detectable amount of

methylenedioxymethetamine (MDMA); in violation of Title 21, United States Code, Section

841(a)(1) and United States Code, Section 2.

A TRUE BILL

_Leonard Doff_
FOREPERSON

_Guy A. Lewis_
GUY A. LEWIS
UNITED STATES ATTORNEY

_Edward R. Ryan_
EDWARD R. RYAN
ASSISTANT UNITED STATES ATTORNEY

2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## PENALTY SHEET

Defendant's Name:  RICHARD SCRIVER          No.:_____

Count #I:

Conspiracy to possess with intent to distribute Methylenedioxymethamphetamine; in

violation of 21:846.

*Max Penalty: Twenty (20) years' imprisonment; $1,000,000 fine.

Count #: II

Possession with intent to distribute Methylenedioxymethamphetamine; in violation of

21:841(a)(1).

*Max Penalty: Twenty (20) years' imprisonment; $1,000,000 fine.

Count #:

*Max Penalty:

Count #:

*Max Penalty:

**\*Refers only to possible term of incarceration, does not include possible fines,
restitution, special assessments, parole terms or forfeitures that may be applicable.**

REV 12/12/96

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA        CASE NO.    00-6215-CR-DIMITROULEAS

v.                              CERTIFICATE OF TRIAL ATTORNEY*

RICHARD SCRIVER                 Superseding Case Information:

attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:          (Yes or No) __NO__
    List language and/or dialect    __English__

4.  This case will take __3__ days for the parties to try.

5.  Please check appropriate category and type of offense listed below:
    (Check only one)                        (Check only one)

|      |                |        |          |         |
|------|----------------|--------|----------|---------|
| I    | 0 to 5 days    | X      | Petty    |         |
| II   | 6 to 10 days   |        | Minor    |         |
| III  | 11 to 20 days  |        | Misdem.  |         |
| IV   | 21 to 60 days  |        | Felony   | x       |
| V    | 61 days and over |      |          |         |

Has a complaint been    filed in this matter? (Yes or No) __Yes__
If yes:
Magistrate Case No.   __00-4118-SNOW__
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of __NO__
Defendant(s) in state custody as of _____
Rule 20 from the _____ District of _____

Is this a potential death penalty case? (Yes or No) __NO__

7.  Does this case originate from a matter pending in the U. S. Attorney's Office prior to April 1, 1999? ___ Yes __X__ No    If yes, was it pending in the Central Region? ___ Yes __x__ No

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No. 00-6215-Cr-Dimitrouleas**

UNITED STATES OF AMERICA,
                    Plaintiff,

v.

RICHARD SCRIVER,
                    Defendant.
_____/



## NOTICE OF OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AND REQUEST DOWNWARD DEPARTURES

COMES NOW, the Defendant, RICHARD SCRIVER, by and through his undersigned counsel and respectfully moves for consideration of downward departures pursuant to U.S.S.G. §5K2.0 or as otherwise noted and also notices this Honorable Court pursuant to Rule 32, Fed.R.Crim.Proc., Rule 88.8, SD Fla. L.R., and U.S.S.G. §6A1.3 of his formal objections to portions of the PSR with respect to the following sections, pages, paragraphs and states:

**I.**

**PSR OBJECTIONS**

**A.    "Offense Conduct." PSR, p. 5 ¶8.**

1.    The PSR purports to recite the background of the Defendant's one and only (recorded) meeting with the CI at a cigar bar on Miami Beach. The PSR unfairly describes that recorded conversation which serves as the predicate for these charges. The recorded conversation describes an extensive discussion

EXHIBIT D-2



about the purchase and sale of commercial real estate.    Admittedly, there was some discussion about the sale of Ecstasy.  The discussions concerning Ecstasy were minimal compared to the real estate based discussions.    However, the paragraph is written in a manner to suggest an overwhelming discussion of Ecstasy, with minimal conversation concerning real estate.    The converse is true.[1]

**B.    Role Assessment.  PSR, p. 6, ¶¶13.**

2.    The government requested and this Honorable Court found that Beeson deserved a minor role adjustment.    The Defendant admits that he did provide Ecstasy to Beeson.    However, in the same manner that the government suggests that Beeson occupied a "minor" role, i.e. as a result of steering the transaction to Scriver (an issue even incorporated within Beeson's Plea Agreement), Scriver merits the same and certainly not harsher treatment merely because he exercised his Sixth Amendment right to trial.  This Defendant relies on the doctrine of the law of the case, the Fifth Amendment's equal protection component, the United States Sentencing Guidelines, and notions of "fundamental fairness" to equate his role to that of Beeson.  Factually, Scriver was to Beeson what Beeson was to the CS.  Merely because Beeson chose to cooperate with law enforcement, whereas the Defendant ultimately chose trial

---

[1] Given the fact that this Honorable Court tried this cause, this court may simply disclaim reliance upon the disputed facts since they may not impact the guideline and sentence calculations.  Rule 32(c)(1), Fed.R.Crim.Proc. ("For each matter controverted, the court must

2

instead of cooperation,[2] is no reason that Beeson and this Defendant should be dissimilarly treated under the law for the limited purposes of role assessment. The government is vested with discretion to decide which individuals to prosecute, which offenses to charge, and what measure of punishment to seek. Cf. *United States v. Batchelder*, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.")    The government may not wield its prosecutorial power in an invidious or arbitrary manner.  However, this Court and not the prosecution, has exclusive jurisdiction in determining the application of the guidelines to any set of facts.  Role issue was and is for the court to decide; not the prosecutor.

3.    Here, the Defendant was not the ultimate supplier of the drugs.  In fact, this Defendant never supplied Ecstasy or any other drug to anyone  prior to Beeson reaching out with the prospect of a multi-million dollar real estate transaction.  Providing Ecstasy was just a tangent to the "deal" of overriding importance, the sale of a number of commercial real estate parcels.

How many times has this Honorable Court witnessed a drug transaction in which the criminal defendant expected no profit for the sale of the drugs and was only doing the drug transaction as an accommodation in order to consummate a

---

make this a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in or will not affect, sentencing.")

3

real estate deal after the Defendant was left impoverished by a divorce? The Defendant respectfully invites this Honorable Court to make a role finding consistent with its finding in Beeson.

4.    The most recent pronouncement on role from the Eleventh Circuit provides this Honorable Court plenary discretion with which to make its findings. Cf. *United States v. DeVaron*, 175 F.3d 930, 938 (11th Cir.1999) (en banc ) (holding that determination of defendant's role in the offense is an ultimate finding of fact subject to the same clear error review as were the subsidiary facts on which it was based).

C.    **OFFENSE LEVEL COMPUTATION, PSR, p. 8**

5.    **Adjustment for Acceptance of Responsibility and Request for Safety Valve Consideration, PSR, p.8, ¶25**

The Defendant respectfully invites this Court to provide a 2 level adjustment for acceptance of responsibility and a 2-level safety valve adjustment. This Circuit as well as the Third, Sixth, Seventh, Ninth, and Tenth Circuits have concluded that the entrapment defense and acceptance of responsibility reduction are compatible. See, *Joiner v. United States*, 103 F.3d 961, 963 (11th Cir.) ("[The defendant] would not have been barred as a matter of law from receiving an adjustment merely because he asserted an entrapment defense at trial, even though some courts have viewed the assertion of an entrapment

---

² As the Court is aware, this choice was driven by the Defendant's fervent desire to avoid

4

defense as the virtual antithesis of acceptance of responsibility. Rather, as with cases involving any other defense, whether a defendant has accepted responsibility is a fact-based question which requires the district court to carefully review all of the evidence bearing on a particular defendant's contrition.") (citation omitted), cert. denied, 520 U.S. 1246 (1997): *U.S. v. Demes*, 941 F.2d 220, 222 (3d Cir.1991) ("[I]t is conceivable to hypothesize a case in which a plea of entrapment would not be inconsistent with the acceptance of responsibility...."); *United States v. Fleener*, 900 F.2d 914, 918 (6th Cir.1990) ("[W]e find that the district court did not err in considering a reduction for acceptance of responsibility even though [the defendant] raised an entrapment defense at trial. Such a defense is no less inconsistent with the Guidelines provision than is a plea of not guilty, which does not raise an absolute bar to a court's consideration."); *United States v. Corral-Ibarra*, 25 F.3d 430, 440 (7th Cir.1994) (finding that an entrapment defense if pleaded in good faith "may possibly qualify" for a § 3E1.1 reduction, but in such a case "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct"); *United States v. Ing*, 70 F.3d 553, 556 (9th Cir.1995) ("The assertion of an entrapment defense is not necessarily incompatible with acceptance of responsibility."); *United States v. Davis*, 36 F.3d 1424, 1435 (9th Cir.1994): ("[T]he district court could not have found that [the defendant] had not accepted

---

deportation to Canada.

5

responsibility solely because he presented an entrapment defense at trial."); *U.S. v. Garcia*, 182 F.3d 1165, 1172 (10th Cir. 1999) (assertion of entrapment defense did not preclude downward adjustment for acceptance of responsibility).

The Defendant incorporates by reference his post arrest statements, post arrest cooperation and trial testimony. In addition to submitting to extensive debriefing, the Defendant, on multiple occasions, wore a wire-transmitting device or alternatively taped calls from his supplier or their "collection agents." The Defendant was threatened by his suppliers and, as requested by the DEA, he wore a transmitting device in order to record those conversations. Beyond that, prior to sentencing the Defendant provided a statement to the Probation Office accepting responsibility for his behavior leading to conviction.

The Defendant furthermore respectfully invites this court to review these statements in their entirety to determine whether it also merits safety valve consideration. At trial and before, the Defendant made startling admissions of serious misconduct, which serves as a factual basis for his conviction. Essentially, he took the witness stand and said, "I did it." However, he claimed that the law of entrapment provided a defense. Although the jury disagreed that the facts provided a "justification" defense, he did make extraordinarily incriminating admissions against his penal interests, which merits sentencing consideration under guideline sections 3E1.1 and 5C1.3. The Defendant did accept responsibility for his misconduct before, at trial, and thereafter.

6

asserted that it was three hundred kilograms. The district court accepted the government's position without making its own findings. The Eleventh Circuit ruled,

> The district court erred in deferring to the Government; the responsibility for determining the truthfulness of the information the defendant provided to the Government was the courts. See *United States v. White*, 119 F.3d 70, 73 (1st Cir. 1997); *United States v. Gambino*, 106 F.3d 1105, 1110 (2nd Cir. 1997); *United States v. Meduka*, 104 F.3d 891, 895 (6th Cir. 1997); *United States v. Thompson*, 81 F.3d 877, 880 (9th Cir. 1996).

*Espinosa*, 172 F.3d at 795.

Therefore, the Defendant respectfully moves this Honorable Court to grant sentencing consideration under U.S.S.G. §3E1.1 for acceptance of responsibility, as well as under 28 U.S.C. §3553(f)(5) and U.S.S.G. §5C1.3, commonly referred to as "safety valve."

## II.

## REQUEST FOR DOWNWARD DEPARTURE CONSIDERATION

### A. Preface

The Probation Office recommends a Total Offense Level of 26, with a recommended guideline imprisonment range of 63-78 months. See PSR, p. 15, ¶62. Based upon the reasons set forth below, beyond his objections, the Defendant respectfully requests consideration of a downward departure.

8

**B.    This Court's Sentencing Hands Are Not Tied by the Base Offense Levels Under the Guidelines.**

Promulgation of the Sentencing Guidelines has placed certain stated limitations on the sentencing court's exercise of discretion, but the Guidelines have neither handcuffed the sentencing judge nor placed him or her in a straightjacket. See, e.g., Gerald B. Tjoflat, The Untapped Potential for Judicial Discretion Under the Federal Sentencing Guidelines: Advice for Counsel, 55 Federal Probation 4 (1991); William W. Wilkins, Jr., Plea Negotiations, Acceptance of Responsibility, Role of the Offender, and Departures: Policy Decisions in the Promulgation of Federal Sentencing Guidelines, 23 Wake Forest L.Rev. 181, 196 (1988) (departure power gives district judges flexibility to impose individualized sentences);  Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L.Rev. 635, 663 (1971) (Circuit courts must give do regard to "the superiority of [the district court's] nether position).

A sentencing court has the authority to impose a sentence outside the guideline range if it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that described." 18 U.S.C. §3553(b) (1994);  see also USSG §5K2.0 (1997) (policy statement explaining appropriate circumstances justifying departure under 18 U.S.C. §3553).  In *Koon v. United States*, the

9

Supreme Court clarified this aspect of the statute, holding that the unusual circumstances justifying the departure must take the case outside the "heartland" of cases contemplated by the applicable guidelines. See *Koon v. United States*, 518 U.S. 81, 94-96 (1996). If a factor is encouraged, see, e.g., §5K2.13 (Diminished Capacity), a court is authorized to depart from the applicable guideline if the guideline does not already take that factor into account. See *Koon*, 116 S.Ct. at 2045. If a factor is discouraged, see, e.g., §5H1.2 (education and vocational skills), or is an encouraged factor already taken into account by the applicable guideline, a district court may depart only if the factor is present to an exceptional degree or in some other way makes the case distinguishable from an ordinary case where the factor is present.

### 1.    Imperfect Entrapment, §5K2.12

A skillful prosecutor presented the government's case. The jury convicted this Defendant, notwithstanding a factually supported entrapment defense. Although the Eleventh Circuit has not yet ruled on the issue, many circuits have recognized that Section 5K2.12 was meant to apply precisely to those situations where a complete defense of entrapment was not present. Cf. U.S.S.G. §5K2.12 (Coercion and Duress as grounds for downward departure). That guideline notes,

> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence below the

10

applicable guideline range. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party....

U.S.S.G. §5K2.12, p.s.

No agent threatened the defendant. However, it was an extraordinarily skillful conman CI who initially proposed the illegal activity and held out the prospect of a One Million Dollar real estate commission in exchange for a relationship cemented by an Ecstasy transaction. At first, there was no mention of such a large quantity of pills. This sort of aggressive encouragement of wrongdoing, the utilization of such extraordinary sums of money placed before a recently divorced, psychologically devastated, and emotionally weakened non-drug offender, although not amounting to a complete defense, may be used as a basis for departure under Section 5K2.12.

Nearly the same facts, but with the use of an agent as the provocateur, served as the basis of an approved downward departure in *United States v. Garza-Juarez*, 992 F.2d 896 (9th Cir. 1993). Therefore, the imperfect entrapment defense serves as a basis for downward departure. See, *United States v. Amparo*, 961 F.2d 288, 292 (1st Cir.) (jury's rejection of duress defense does not preclude downward departure under section 5K2.12), *cert. denied sub nom.*

11

*Sanchez v. United States*, 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992);

*United States v. Cheape*, 889 F.2d 477, 480 (3d Cir.1989) (vacating sentence

when district court ruled that jury's rejection of coercion defense precluded

downward departure under section 5K2.12); *United States v. Whitetail*, 956 F.2d

857, 863 (8th Cir.1992) (vacating sentence when district court ruled that jury's

rejection of battered-woman defense precluded application of section 5K2.12);

see also *United States v. Giles*, 768 F.Supp. 101, 103 (S.D.N.Y.) (granting

downward departure based on "the manner in which [defendant] was set up for

this crime by the Government's agent," even though jury rejected entrapment

defense), *aff'd*, 953 F.2d 636 (2d Cir.1991) (table), *cert. denied*, 503 U.S. 949

(1992); *United States v. Nelson*, 740 F.Supp. 1502, 1516 (D.Kan.1990) (granting

downward departure under section 5K2.12 based on coercion even though jury

rejected coercion defense; citing *Cheape*).

The Ninth Circuit has recognized that a downward departure may be

appropriate when government agents used persuasion alone, not threats.    In

*United States v. Takai*, 941 F.2d 738 (9th Cir.1991), the defendant participated in

a scheme to bribe a government official.  The district court granted a downward

departure in part because:

> [t]he seriousness of defendants' participation is
> mitigated by the conduct of the government agent.
> While there was no allegation of entrapment, there was
> evidence at the sentencing hearing that Agent
> Goldman's conduct influenced defendants' decisions to
> continue playing a pivotal role.

12

*Id.* at 741. The Ninth Circuit affirmed the sentence, even though the agent's conduct "did not constitute entrapment in a legal sense." *Id.* at 744.

Most recently, the Second Circuit addressed the issue in *U.S. v. Bala* stating,

> "While to date we have not decided whether imperfect entrapment is proscribed by the guidelines as a ground for downward departure, we can find nothing in the guidelines to prohibit a district court from considering conduct by the government that does not give rise to an entrapment defense but that is nonetheless "aggressive encouragement of wrongdoing." Garza-Juarez, 992 F.2d at 912; see also *U. S. v. Giles*, 768 F.Supp. 101, 103-04 (S.D.N.Y.), aff'd without op., 953 F.2d 636 (2d Cir.1991). Moreover, the policy statement in Section 5K2.12 can reasonably be read to authorize such a departure in appropriate cases. Nevertheless, it is for the district courts to decide for themselves whether, in a particular case, a downward departure based on imperfect entrapment would remove that case from the "heartland of the applicable Guideline." See *United States v. Bonnet- Grullon*, 212 F.3d 692, 700 (2d Cir.2000) ("The determination of whether a case is within the heartland of the applicable guideline cannot be a matter of generalization.").

2000 WL 1877041, *3 (2nd Cir. (N.Y.))

This Court is faced with a similar situation. Based on the precedents discussed above, therefore, the imperfect entrapment defense does serve as a basis for downward departure.

13

2.    **Diminished Capacity, U.S.S.G. 5K2.13**

The Defendant merits consideration for a departure premised upon diminished capacity.[3]  The Commission expressly encourages district courts to consider whether the defendant suffered from "significantly reduced mental capacity" at the time of the offense when deciding whether to grant a downward departure.   See U.S. Sentencing Guidelines Manual § 5K2.13 (1998). The application note defines "significantly reduced mental capacity" to mean that the defendant "has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." Id. application n. 1. The amended section also provides that, "[i]f a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." Id. §5K2.13.  See also, U.S. v. Steele, 178 F.3d 1230, 1240 (11th Cir. 1999)

3.    **Extraordinary "Acceptance of Responsibility"**

Undersigned counsel has researched the statistical compilations of the Sentencing Commission, which addresses both the percentile of downward departures granted and the subset percentile of the classification for those downward departures.  "Acceptance of responsibility" (which we can assume is "extraordinary acceptance") is labeled as the reason for downward departures in

---

[1] The medical report has not been received by counsel.  A copy will be submitted upon receipt.

14

a significant number of those cases.  See *1999 Source Book of Federal Statistics*, Table 25, Reasons Given by Sentencing Courts Upward and Downward Departures, "general mitigating circumstances", numbering 1254 constituting 13%; acceptance of responsibility, numbering 148, constituting 1.5%; *1998 Source Book of Federal Statistics*, Table 25, Reasons for Downward Departures, "general mitigating circumstances", numbering 1054, 14%; acceptance of responsibility, numbering 121, 1.6%.  See Exhibits A and B.

This Defendant confessed as soon as he was arrested.  He provided law enforcement with the identity of his drug supplier.  He provided the background facts concerning his criminal involvement.  He wore a wire while meeting with collections agents sent by his supplier.  He recorded threatening calls from his suppliers.  He worked with law enforcement agents as soon as he was arrested. He related his prior conspiratorial conversations with his co-defendant.  The Defendant provided the Drug Enforcement Administration with documents evidencing the identity of his supplier, provided law enforcement with a fixed location of their warehouse, and expressed remorse in very tangible terms.  He accepted responsibility in extraordinarily tangible terms.

15

4.    **Aberrant Behavior**

The new guideline states,

> **§5K2.20. Aberrant Behavior (Policy Statement)**
>
> A sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior. However, the court may not depart below the guideline range on this basis if (1) the offense involved serious bodily injury or death; (2) the defendant discharged a firearm or otherwise used a firearm or a dangerous weapon; (3) the instant offense of conviction is a serious drug trafficking offense; (4) the defendant has more than one criminal history point, as determined under Chapter Four (Criminal History and Criminal Livelihood); or (5) the defendant has a prior federal, or state, felony conviction, regardless of whether the conviction is countable under Chapter Four.

The Defendant respectfully invites this Honorable Court to find that Scriver's misconduct, in this case, amounts to aberrant behavior and constitutes an additional basis for downward departure consideration. In *United States v. Withrow*, 85 F.3d 527, 529 (11th Cir. 1996), the Eleventh Circuit concludes that the district court has discretion to depart downward from Sentencing Guidelines after making careful factual determination that defendant's offense conduct constituted single, aberrant act.    "The aberrance of a criminal act is an encouraged factor for departure." *United States v. Talk*, 158 F.3d 1064, 1072 (10th Cir.1998), cert. denied, 525 U.S. 1164 (1999).    The determination of whether an individual defendant's offense conduct is aberrational, like the

16

decision to depart, requires consideration of unique factors not readily susceptible of useful generalization. In *United States v. Withrow*, 85 F.3d 527, 529 (11th Cir. 1996), in a matter of first impression the Eleventh Circuit notes, "Here, the district court's decision to refuse *Withrow's* request for downward departure was based explicitly on the court's understanding that it lacked the discretion to consider such a request. In light of the court's unambiguous statement that it was not authorized to depart in this case, we conclude that the court's decision is reviewable. We therefore address whether the Sentencing Guidelines permit a downward departure based on the specific factor advanced by *Withrow*."

The Eleventh Circuit notes that U.S.S.G. Ch. 1, Pt. A, 4(d) provides a specific framework to which the court must refer in sentencing a first-time offender who likely would have received a probationary sentence under the pre-guidelines regime. Scriver meets this generalized qualification. The concluding sentence of the referenced section states that "[t]he **Commission, of course, has not dealt with the single acts of aberrant behavior that still may justify probation at higher offense levels through departures.**" *Id.* (Emphasis added). *Withrow* notes, "All circuits that have addressed and resolved the question posed by this appeal have concluded that single acts of aberrant behavior were excluded from consideration in the formulation of the guidelines and thus might justify sentences below the guideline range even in cases where

17

probation is not a viable option.  See, e.g., *United States v. Duerson*, 25 F.3d 376, 380 (6th Cir.1994)."

III.

## CORRECTED OFFENSE LEVEL COMPUTATION, PSR, P. 8 ¶¶18-26.

In conclusion, the Defendant respectfully invites this Honorable Court to consider the following corrected PSR calculations:

PSR, ¶18, Base Offense Level:

289.6 of MDA kilograms of cocaine, §2D1.1(conversion table)　　26

PSR, ¶21, Adjustment for Role in the Offense.　　-2

PSR ¶25 Adjustment for Acceptance of Responsibility.　　-2

PSR, ¶ Safety Valve.　　-2

PSR, ¶30 Total Offense Level.　　18

PSR, ¶ Guideline Range.　　27-33 months

**Departure Findings**

**Imperfect Entrapment, §5K2.12**

**Diminished Capacity, U.S.S.G. §5K2.13**

**Extraordinary "Acceptance of Responsibility"**

**Aberrant Behavior**

**Departure Guideline Range　Zone C　　12 - 16 months**

**Zone C allows intermediate sentencing sanctions.**

WHEREFORE, Defendant respectfully files these objections and prays that this Honorable Court enter an order finding that a downward departure is merited. The Defendant respectfully seeks findings that individually or as a consequence of a combination of these factors this is an unusual or atypical case such that this exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that described in the Guidelines.

Respectfully submitted,

Neil M. Schuster
407 Lincoln Road, Suite 11-B
Miami Beach, FL   33139
Telephone: (305) 673-3737

By: _____
     Neil M. Schuster
     Florida Bar No. 216909

Jeanne Baker, Esq.
2937 S.W. 27 Avenue, #202
Miami, Florida  33133
Office: 305-443-1600
Fl. Bar #: 880700

David Tucker, Esq.
2600 S. Douglas Road, Suite 1108
Coral Gables, Florida  33134-6143
Office: 305-461-3627

19

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed to Dana Washington, Assistant United States Attorney, Office of the United States Attorney, 500 East Broward Blvd., Ft. Lauderdale, Florida 33301 and Todd Eisinger, U.S. Probation Officer, Room 315, U.S. Courthouse, 300 N.E. First Avenue, Miami, Florida 33132-2126 this 22 day of February, 2001.

By: _____
        Neil M. Schuster

20

# Tables 24-25

## REASONS GIVEN BY SENTENCING COURTS FOR UPWARD AND DOWNWARD DEPARTURES
### Fiscal Year 1998

### Table 24

| REASONS FOR UPWARD DEPARTURES[1] | Number | Percent |
| --- | --- | --- |
| Criminal history category does not reflect seriousness | 159 | 33.9 |
| Extreme conduct | 39 | 8.3 |
| Risk of future conduct based on prior conduct or record | 38 | 8.1 |
| General aggravating circumstances | 30 | 6.4 |
| Pursuant to plea agreement | 25 | 5.3 |
| Weapons/dangerous instrumentalities | 25 | 5.3 |
| Nature or seriousness of the offense | 14 | 3.0 |
| Extreme psychological injury | 13 | 2.8 |
| Criminal purpose | 13 | 2.8 |
| Physical injury | 12 | 2.6 |
| Dangerous or inhumane treatment | 10 | 2.1 |
| Death | 7 | 1.5 |
| Disruption of governmental function | 7 | 1.5 |
| Monetary value does not reflect extent of harm | 6 | 1.3 |
| Several persons injured | 5 | 1.1 |
| Further obstruction of justice | 5 | 1.1 |
| Guideline factors do not reflect offense seriousness | 5 | 1.1 |
| Outside applicable time period, but portion of income | 4 | 0.9 |
| Deportation | 4 | 0.9 |
| Child Abuse | 3 | 0.6 |
| Drug amount or drug purity | 3 | 0.6 |
| Public welfare | 2 | 0.4 |
| Other | 40 | 11.3 |

### Table 25

| REASONS FOR DOWNWARD DEPARTURES[1] | Number | Percent |
| --- | --- | --- |
| Deportation | 1,449 | 19.2 |
| Pursuant to plea agreement | 1,421 | 18.8 |
| General mitigating circumstances | 1,054 | 14.0 |
| Criminal history category does not reflect seriousness | 748 | 9.9 |
| Isolated incident/aberrant behavior | 598 | 7.9 |
| Family ties/responsibilities | 363 | 4.8 |
| Physical condition | 222 | 2.9 |
| Diminished capacity | 192 | 2.5 |
| Mental/emotional conditions | 131 | 1.7 |
| Not representative of the heartland | 131 | 1.7 |
| Acceptance of responsibility | 121 | 1.6 |
| Rehabilitation | 114 | 1.5 |
| Coercion and duress | 76 | 1.0 |
| Age | 75 | 1.0 |
| Mule/Role in the offense | 48 | 0.6 |
| Dollar amount | 42 | 0.6 |
| Cooperation (motion unknown) | 40 | 0.5 |
| Adequate to meet purposes of sentencing | 40 | 0.5 |
| Community ties | 36 | 0.5 |
| Voluntary disclosure (§5K2.16) | 36 | 0.5 |
| Sufficient punishment | 28 | 0.4 |
| Lesser harm | 20 | 0.3 |
| Other | 557 | 7.4 |

[1]Of the 30,734 cases, 591 were recorded as upward departures. Information on departure reasons was available in 177 of these cases which cited 469 reasons for upward departure. Courts often provided more than one reason for departure; consequently, the percentages across all reasons for departure may add up to more than 100 percent. The "Other" category includes all reasons provided less than two times among relevant cases.

[1]Of the 30,734 cases, 6,509 were recorded as downward departures. Information on departure reasons was available in 6,271 of these cases which cited 7,542 reasons for downward departure. Courts often provided more than one reason for departure; consequently, the percentages across all reasons for departure may add up to more than 100 percent. The "Other" category includes all reasons provided less than 20 times among relevant cases. Cases in which substantial assistance was given as a reason for a downward departure were not included in this table. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 1998 Datafile, USSCFY98.

EXHIBIT A

# Tables 24-25

## REASONS GIVEN BY SENTENCING COURTS FOR UPWARD AND DOWNWARD DEPARTURES
### Fiscal Year 1999

### Table 24

| REASONS FOR UPWARD DEPARTURES[1] | Number | Percent |
|---|---|---|
| Criminal history category does not reflect seriousness | 126 | 32.6 |
| Extreme conduct | 39 | 10.1 |
| Risk of future conduct based on prior conduct or record | 33 | 8.5 |
| Extreme psychological injury | 23 | 6.0 |
| General aggravating circumstances | 19 | 4.9 |
| Pursuant to plea agreement | 14 | 3.6 |
| Nature or seriousness of the offense | 12 | 3.1 |
| Physical injury | 10 | 2.6 |
| Criminal purpose | 7 | 1.8 |
| Death | 6 | 1.6 |
| Several persons injured | 5 | 1.3 |
| Large number of aliens | 4 | 1.0 |
| Guideline factors do not reflect offense seriousness | 4 | 1.0 |
| Weapons/dangerous instrumentalities | 4 | 1.0 |
| Disruption of governmental function | 4 | 1.0 |
| Monetary value does not reflect extent of harm | 4 | 1.0 |
| Public welfare | 3 | 0.8 |
| Further obstruction of justice | 3 | 0.8 |
| Property damage or loss | 3 | 0.8 |
| Drug amount or drug purity | 2 | 0.5 |
| Negligence involved | 2 | 0.5 |
| Child abuse | 2 | 0.5 |
| Deportation | 2 | 0.5 |
| Other | 55 | 14.2 |

### Table 25

| REASONS FOR DOWNWARD DEPARTURES[2] | Number | Percent |
|---|---|---|
| Pursuant to plea agreement | 1,619 | 16.7 |
| General mitigating circumstances | 1,254 | 13.0 |
| Criminal history overrepresents defendant's involvement | 1,018 | 10.5 |
| Fast track | 936 | 9.7 |
| Deportation | 849 | 8.8 |
| Offense behavior was an isolated incident | 818 | 8.4 |
| Family ties and responsibilities | 492 | 5.1 |
| Physical condition | 274 | 2.8 |
| Diminished capacity | 265 | 2.7 |
| Rehabilitation | 194 | 2.0 |
| Not representative of the heartland | 193 | 2.0 |
| Acceptance of responsibility | 148 | 1.5 |
| Mental and emotional conditions | 117 | 1.2 |
| Age | 101 | 1.0 |
| Coercion and duress | 79 | 0.8 |
| Mule/role in the offense | 74 | 0.8 |
| Adequate to meet purposes of sentencing | 58 | 0.6 |
| Cooperation (motion unknown) | 44 | 0.5 |
| Drug dependence/alcohol abuse | 37 | 0.4 |
| Time served | 37 | 0.4 |
| Voluntary disclosure (§5K2.16) | 35 | 0.4 |
| Community ties | 33 | 0.3 |
| Dollar amount | 29 | 0.3 |
| Sufficient punishment | 27 | 0.3 |
| Victim's conduct | 27 | 0.3 |
| Deterrence | 26 | 0.3 |
| Previous employment record | 22 | 0.2 |
| Lesser harm | 21 | 0.2 |
| Restitution | 20 | 0.2 |
| Other | 836 | 8.6 |

[1] Of the 55,557 cases, 386 were recorded as upward departures. Information on departure reasons was available in 308 of these cases which cited 386 reasons for upward departure; consequently, the percentages across all reasons for departure may add up to more than 100 percent. The "Other" category includes all reasons provided fewer than two times among relevant cases.

[2] Of the 55,557 cases, 8,104 were recorded as downward departures. Information on departure reasons was available in 8,119 of these cases which cited 9,683 reasons for downward departure. Courts often provided more than one reason for departure; consequently, the percentages across all reasons for departure may add up to more than 100 percent. The "Other" category includes all reasons provided fewer than 20 times among relevant cases. Cases in which substantial assistance was given as a reason for a downward departure were not included in this table. Descriptions of variables used in these tables are provided in Appendix A.

EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,                    CASE NO.  00-6215-CR-DIMITROULEAS

      Plaintiff,
vs.                                          **VERDICT**

RICHARD SCRIVER,

      Defendant.
_____ /

WE, THE JURY, FIND: the Defendant RICHARD SCRIVER,

**As to Count I**    *Guilty AS chARged*
                 GUILTY AS CHARGED // GUILTY-LESSER // NOT GUILTY

**As to Count II**   *Guilty As chARged*
                 GUILTY AS CHARGED // GUILTY-LESSER // NOT GUILTY

as charged in the Indictment.

So say we all.

*Anthony Catapano*                          11/30/00
FOREPERSON                                   DATE



USDC FLSD 245B (Rev. 4/00) Sheet1 - Judgment in a Criminal Case

# United States District Court

## Southern District of Florida

### FORT LAUDERDALE DIVISION

UNITED STATES OF AMERICA

V.

RICHARD SCRIVER

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

**Case Number:  00-6215-CR-WPD**

Counsel For Defendant: Jeanne Baker, David Tucker, Neil Schuster
Counsel For The United States: Dana Washington, AUSA
Court Reporter: Robert Ryckoff

**THE DEFENDANT:**

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☒ **Was found guilty on count(s) 1s and 2s
after a plea of not guilty**

| Title & Section Number(s) | Nature of Offense | Date Offense Concluded | Count |
|---|---|---|---|
| 21 USC § 846 | Conspiracy to Possess with Intent To Distribute 3,4 Methylenedioxyamphetamine (MDA) | 5/20/2000 | 1s |
| 21 USC § 841 (a)(1) | Possession with Intent to Distribute Methylenedioxyamphetamine (MDA) | 5/19/2000 | 2s |

The defendant is sentenced as provided in pages 2 through __8__ Of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s)                    (Is) (are) dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.: 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
Defendant's Date of Birth: 12/26/1953
Defendant's USM Number: 55313-004

Defendant's Residence Address:
  Federal Detention Center
  33 NE 4th Street
  Miami, FL 33132

Defendant's Mailing Address:
  Federal Detention Center
  33 NE 4th Street
  Miami, FL 33132

**March 7, 2001**
Date of Imposition of Judgment

Signature of Judicial Officer

**William P. Dimitrouleas**
**United States District Judge**

Date: March 8, 2001

EXIBIT D-3



USDC FLSD 245B (Rev. 6/01) Sheet 2 - Imprisonment

DEFENDANT: **SCRIVER, RICHARD**
CASE NUMBER: **00-6215-CR-WPD**

Judgment-Page _2_ of _8_

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 36 months on each of Count 1s and 2s to run concurrent.

X    The Court makes the following recommendations to the Bureau of Prisons:  designation to a Miami facility.

⎯    The defendant is remanded to the custody of the United States Marshal.

X    The defendant shall surrender to the Office of the United States Marshal in Miami, FL by Noon on 3/9/01.

☐    At                A.m. / p.m. on

☐    as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:.

☐    Before 2:00 p.m. on

☐    as notified by the United States Marshal.

☐    As notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ To _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By_____
Deputy U.S. Marshal

USDC FLSD 245B (Rev. 4/01) Sheet 3 - Supervised Release

DEFENDANT: **SCRIVER, RICHARD**
CASE NUMBER: **00-6215-CR-WPD**

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of          Three (3) years on each Count to run concurrent.

The defendant shall report to the probation office in the district in which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.
The defendant shall not illegally possess a controlled substance.
*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

☐ The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

☒ **The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.**

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

☒ **The defendant shall also comply with the additional conditions on the attached page.**

## STANDARD CONDITIONS OF SUPERVISION

1) The defendant shall not leave the judicial district without the permission of the court or probation officer;
2) The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each Month;
3) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) The defendant shall support his or her dependents and meet other family responsibilities;
5) The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other Acceptable reasons;
6) The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled Substance or any paraphernalia related to any controlled substance, except as prescribed by a physician;
8) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a Felony unless granted permission to do so by the probation officer;
10) The defendant shall permit a probation officer to visit him or her at anytime at home or elsewhere and shall permit confiscation of any Contraband observed in plain view of the probation officer;
11) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the Permission of the court;
13) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal Record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the Defendant's compliance with such notification requirement

USDC FLSD 245B (Rev. 9/Oct) Sheet 3A. Special Conditions of Supervision

DEFENDANT: **SCRIVER, RICHARD**
CASE NUMBER: **00-6215-CR-WPD**

Judgment-Page 4 of 8

## SPECIAL CONDITIONS OF SUPERVISION

At the completion of the defendant's term of imprisonment, the defendant shall be surrendered to the custody of the Immigration and Naturalization Service for deportation proceedings consistent with the Immigration and Nationality Act.

If deported, the defendant shall not reenter the United States without the express permission of the United States Attorney General. The term of supervision shall be non-reporting if the defendant resides outside the United States. If the defendant should reenter the United States within the term of supervised release, the defendant is to report to the nearest United States Probation Office within 72 hours of his or her arrival.

The defendant shall participate in an approved treatment program for drug and/or alcohol abuse as directed by the U.S. Probation Office. Participation may include inpatient/outpatient treatment, if deemed necessary. The defendant will contribute to the costs of services rendered (copayment) in an amount determined by the probation officer, based on ability to pay, or availability of third party payment.

USDC FLSD 245B (Rev 9/00) Sheet 5, Part A - Criminal Monetary Penalties

Judgment-Page _5_ of _8_

DEFENDANT: SCRIVER, RICHARD
CASE NUMBER: 00-6215-CR-WPD

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **Totals:** | $200.00 | $ 2,000.00 | S |

☐ The determination of restitution is deferred until            . An Amended Judgment in a Criminal Case (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid in full prior to the United States receiving payment.

| Name of Payee | ** Total Amount of Loss | Amount of Restitution Ordered | Priority Order Or Percentage of Payment |
|---|---|---|---|
| | | | |
| **Totals:** | S | S | |

☐ If applicable, restitution amount ordered pursuant to plea agreement. . . . . . . . . . . . . .   S

☐ The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. 3612(f). All of the payment options on Sheet 5, Part 8 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

  ☐  The interest requirement is waived for the fine and/or restitution.

  ☐  The interest requirement for the fine and/or restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994 but before April 23, 1996.

USDC FLSD 245B (Rev. 9/00) Sheet 5, Part B - Schedule of Payments

DEFENDANT: **SCRIVER, RICHARD**
CASE NUMBER: **00-6215-CR-WPD**

Judgment-Page _6_ of _8_

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A  [X]  **Lump sum payment of $ 2,200.00 Due immediately.**

    Not later than         , or
    In accordance with C, D, or E below; or

B  [ ]  Payment to begin immediately (may be combined with C, D, or E); or

C  [ ]  Payment in     (E.g., equal, weekly, monthly, quarterly) installments of $     Over a period of
    (E.g., months or years), to commence     (E.g., 30 to 60 days) after the date of this judgment; or

D  [ ]  Payment in     (E.g., equal, weekly, monthly, quarterly) installments of $     Over a period of
    (E.g., months or years), to commence     (E.g., 30 to 60 days) after release from imprisonment to a term
    Of supervision; or

E  [ ]  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court, unless otherwise directed by the court, the probation officer, or the United States attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

The fine/restitution is payable to the U.S. COURTS and is to be addressed to:

    **U.S. CLERK'S OFFICE**
    **ATTN: FINANCIAL SECTION**
    **301 N. MIAMI AVENUE, ROOM 150**
    **MIAMI, FLORIDA 33132**

The fine/restitution is payable immediately. The U.S. Bureau of Prisons, U.S. Probation Office and the U.S. Attorney's Office are responsible for the enforcement of this order.

[ ]  Joint and Several
    Defendant Name, Case Number, and Joint and Several Amount:

[ ]  The defendant shall pay the cost of prosecution.

[ ]  The defendant shall pay the following court cost(s):

[ ]  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

USPC FLSD 245B (Rev. 9/00) Sheet 6A - Statement of Reasons

DEFENDANT: **SCRIVER, RICHARD**
CASE NUMBER: **00-6215-CR-WPD**

# STATEMENT OF REASONS

☐  The Court adopts the factual findings and guideline application in the presentence report.

## OR

☒  The Court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary):The court found that the defendant accepted responsibility pursuant to 3E1.1 and granted a 2 level reduction to the offense level. The Court further found that the defendant qualifies for the safety valve pursuant to 5C1.2

**Guideline Range Determined by the Court:**

Total Offense Level: 22

Criminal History Category: I

Imprisonment Range: 41 to 51 months

Supervised Release Range: 2 to 3 years

Fine Range: $7,500.00 to $1,000,000.00

☒  **Fine waived or below the guideline range because of inability to pay.**

Total amount of Restitution: $

☐  Discretionary restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U.S.C. 3663(a)(B)(ii) (or in offenses committed before April 23, 1996, pursuant to 18 U.S.C. § 3663(d)).

☐  Restitution pursuant to the mandatory victim restitution provisions is not ordered in this title 18 property offense because the number of identifiable victims is so large as to make restitution impracticable, pursuant to 18 U.S.C. § 3663A(c)(3)(A).

☐  Restitution pursuant to the mandatory victim restitution provisions is not ordered in this title 18 property offense because determining complex issues of fact and related to the cause of amount of the victim's losses would complicate or prolong The sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the Sentencing process, pursuant to 18 U.S.C. § 3663A(c)(3)(B).

☐  For offenses committed on or after September 13, 1994 but before April 23, 1996 that require the total amount of loss to be stated, pursuant to Chapters 109A, 110, 110A, and 113A of Title 18, restitution is not ordered because the economic Circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the Payment of any or some portion of a restitution order in the foreseeable future under any reasonable schedule of payments.

☐  Partial restitution is ordered, pursuant to 18 U.S.C. § 3553(c), for the following reason(s):

USDC FLSD 245B (Rev 9/00) Sheet 6B - Statement of Reasons

DEFENDANT: **SCRIVER, RICHARD**
CASE NUMBER: **00-6215-CR-WPD**

Judgment-Page  8  of 8

## STATEMENT OF REASONS

[  ]  The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.

### OR

[  ]  The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s):

### OR

[X]  **The sentence departs from the guideline range:**

    [  ]  upon motion of the government, as a result of defendant's substantial assistance.

    [X]  **For the following specific reason(s):**

       the defendant's aberrant behavior pursuant to 5K2.2

Tallahassee, Florida 32301

USDC FLSD 245B (Rev. 9/00) Sheet1 - Judgment in a Criminal Case

# United States District Court

## Southern District of Florida

### FORT LAUDERDALE DIVISION

UNITED STATES OF AMERICA
v.
RICHARD SCRIVER

JUDGMENT IN A CRIMINAL CASE
(For Offenses Committed On or After November 1, 1987)

**Case Number:   00-6215-CR-WPD**

Counsel For Defendant: Jeanne Baker, David Tucker,Neil Schuster
Counsel For The United States: Dana Washington, AUSA
Court Reporter: Robert Ryckoff

## THE DEFENDANT:

- ☐ pleaded guilty to count(s)
- ☐ pleaded nolo contendere to count(s) which was accepted by the court.
- ☒ Was found guilty on count(s) 1s and 2s after a plea of not guilty

| Title & Section Number(s) | Nature of Offense | Date Offense Concluded | Count |
|---|---|---|---|
| 21 USC § 846 | Conspiracy to Possess with Intent To Distribute 3,4 Methylenedioxyamphetamine (MDA) | 5/20/2000 | 1s |
| 21 USC § 841 (a)(1) | Possession with Intent to Distribute Methylenedioxyamphetamine (MDA) | 5/19/2000 | 2s |

The defendant is sentenced as provided in pages 2 through __8__ Of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

- ☐ The defendant has been found not guilty on count(s)

- ☐ Count(s)                    (Is) (are) dismissed on the motion of the United States.

   **IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.: 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
Defendant's Date of Birth: 12/26/1953
Defendant's USM Number: 55313-004

Defendant's Residence Address:
   Federal Detention Center
   33 NE 4th Street
   Miami, FL 33132

Defendant's Mailing Address:
   Federal Detention Center
   33 NE 4th Street
   Miami, FL 33132

March 7, 2001
Date of Imposition of Judgment

Signature of Judicial Officer

William P. Dimitrouleas
United States District Judge

USDC FLSD 245B (Rev. 9/00) Sheet 2 - Imprisonment

DEFENDANT: **SCRIVER, RICHARD**
CASE NUMBER: **00-6215-CR-WPD**

Judgment-Page _2_ of _8_

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 36 months on each of Count 1s and 2s to run concurrent.

[X] **The Court makes the following recommendations to the Bureau of Prisons:** designation to a Miami facility.

[ ] The defendant is remanded to the custody of the United States Marshal.

[X] **The defendant shall surrender to the Office of the United States Marshal in Miami, FL by Noon on 3/9/01.**

     [ ] At      A.m. / p.m. on

     [ ] as notified by the United States Marshal.

[ ] The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons

     [ ] Before 2:00 p.m. on

     [ ] as notified by the United States Marshal.

     [ ] As notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on ___03-19-2001___ To ___Federal Detention Center Miami, Fl.___

at _33 NE 4 St. Miami, Fl_ With a certified copy of this judgment.

          Monica S. Wetzel, Warden
          ~~UNITED STATES MARSHAL~~

          By _Ariel O. Guerrero, L.I.E._
          ~~Deputy U.S. Marshal~~

## A F F I D A V I T

I, ARTHUR BARRON, do hereby give this Affidavit pertaining to a telephone conversation with Jean Baker, an attorney, in regard to Richard Scriver.

Approximately two weeks prior to the trial of Richard Scriver in federal court, which was held on November 30, 2000, I was contacted by Mr. Scriver's attorney, Jean Baker. Ms. Baker called to ask me if I would appear in court as a character witness on behalf of Mr. Scriver. I agreed to appear as a defense character witness for Mr. Scriver.

Ms. Baker went on to ask me what was my relationship with Mr. Scriver. I told Ms. Baker that I had met Mr. Scriver in July of 1999 at the Eden Roc Hotel in Miami Beach, where the both of us were members of the Eden Roc Spa. I explained that through casual conversation, Mr. Scriver became aware that I had extensive experience as a real estate property manager, and recommended me for a position with a real estate company. Through Mr. Scriver's recommendation, I was hired as a part-time property manager for a residential property in Miami (until the property was sold).

I also informed Ms. Baker that my primary employment was with Miami-Dade Eleventh Judicial Circuit Court where I work as a Bailiff and Law Clerk for a judge at the Richard E. Gerstein Justice Building in Miami.

Ms. Baker asked me as to what was my opinion of Mr. Scriver as a business person and as a social friend. I told Ms. Baker that I did not socialize with Mr. Scriver, outside of the Eden Roc Spa, and that I knew him mainly as a business person. I thought that Mr. Scriver was an intelligent, honest and trustworthy businessman, and that he had a very personable demeanor. He was

Exhibit "E"

Page 2, Affidavit of Arthur Barron

the kind of person that people respected and was well liked. Ms. Baker responded to my description

of Mr. Scriver's character by saying that when I appear in court I should stress my opinion about his

trustworthiness, which she believed would have a positive affect on the jury.

Ms. Baker then asked me if I knew any details about Mr. Scriver's case that he was going to

be tried on in federal court. I told Ms. Baker that I did not know anything about the events leading

to Mr. Scriver's arrest, but that Mr. Scriver had told me about his arrest and interrogation by law

enforcement officers immediately following his arrest, and that Mr. Scriver believed that he had been

entrapped. Ms. Baker told me that when I appeared in court as a character witness at trial, if asked

by the prosecutor, I should tell the prosecutor that I do not know details about Mr. Scriver's case.

I mentioned to Ms. Baker that when Mr. Scriver told me about being questioned by law

enforcement officers after his arrest, that I asked Mr. Scriver if he had been given his Miranda rights

before speaking to the officers, and that Mr. Scriver told me that the officers had not given him his

Miranda rights. I went on to ask if Ms. Baker if she was planning on using the fact that Mr. Scriver

was not given his Miranda rights before making statements to the officers. Ms. Baker replied that

she was not going to go into that issue because it would antagonize the prosecution. She explained

that her defense theory was going to be based on Mr. Scriver's mental depression due to his divorce

and his remorse in getting involved in the events that lead to his arrest. Ms. Baker made a point in

stating that based on her experience as a criminal defense attorney, that this was the best defense for

Mr. Scriver. Since I still expressed my concern about this Miranda issue, Ms. Baker said, "Trust me,

this is the best way to go."

Page 3, Affidavit of Arthur Barron

After the discussion about the Miranda rights issue, we concluded our conversation with Ms. Baker saying that she would notify me as to when I would appear in court.

I affirm that to the best of my recollection this Affidavit is a true statement.

By: Arthur Barron                    Date

Witnessed By:

Date

Print Name of Witness    Kattia Sicle

State of Florida
County of Miami Dade

Sworn to and subscribed before me this 28 day of November 2001, by Arthur Barron.

Notary

OFFICIAL NOTARY SEAL
DIANA M PETITTO
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC955538
MY COMMISSION EXP. SEPT 13, 2004

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

RICHARD SCRIVER,                    CIVIL CASE NO:_____

     Petitioner,                    [CRIM. NO. 00-6215 CR WPDJ


UNITED STATES OF AMERICA,

     Respondent.

_____

### AFFIDAVIT OF RICHARD SCRIVER

1.    That I was advised by my trial counsel, Jeanne Baker and David Tucker, that although I sought an aggressive cross-examination of government agents that by counsel would not do so because it would upset the trial judge and/or the prosecutor.

2.    That I believed the above-mentioned trial counsel would aggressively pursue my defense by inquiring into all aspects of my defense

3.    That I was not cognizant nor fully advised of the trial strategy presented at trial, and that such trial strategy truly addressed sentencing issues.

4.    That I advised my counsel to aggressively pursue all issues, including whether proper Miranda warnings were given at the suppression hearing and at jury trial, and this was not done. My trial counsel advised me that such strategy would convince trial judge that I was "lying about everything."

*Exhibit "F"*

5.  That at no time did I give my previous trial counsel, Arthur
    Marchetta and/or Scott Tucker any permission to divulge, reveal or
    otherwise trade away any confidential attorney-client information.
    Furthermore, I did not know of any arrangements, agreements or
    tacit understandings between those prior counsel and government
    agents and/or counsel for co-defendant.

6.  At no time did I give permission to any counsel to reveal to anyone
    nor make any agreements contrary to my interests.

7.  At all times during the preparation of my trial , the pre-trial
    hearing, the jury trial, and post-trial proceedings, I relied on the
    professional advice of my trial counsel.  At the time of my
    sentencing and the subsequent waivers of appeal, I was not
    advised of all ramifications of that waiver, in particular, the nature
    of the appealable issues and the subsequent limitation placed pose-
    appeal remedies.  If I had been fully apprised of those
    consequences and issues to be appealed, I would not have pursued
    the waiver of appeal.  Furthermore, at the time of the signing of
    said waiver, I was suffering from a major psychological illness and
    being treated by a medical expert who reported my condition to my
    trial counsel.

I, RICHARD SCRIVER, DO SOLEMNLY SWEAR THAT I HAVE READ THE

FOREGOING ~~COMPLAINT~~ AFFIDAVIT AND THAT ALL THE FACTS CONTAINED  THEREIN ARE

TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

RICHARD SCRIVER

State of Florida)
County of _____)

    Before me, the undersigned authority, personally appeared RICHARD
SRIVER who after being duly sworn deposes and says that the foregoing
Complaint has been read and the facts contained therein are true.

    SWORN TO AND SUBSCRIBED before me this **3** day of
_____**MARCH**_____, 2002

                    NOTARY PUBLIC
                    State of Florida at Large

___Personally Known
___Produced identification -  Type of identification produced

I, EUGENE ZENOBI, DO SOLEMNLY SWEAR THAT ON MARCH 3, 2002 I

PERSONALLY WITNESSED THE SIGNATURE OF RICHARD SCRIVER, WHO I

PERSONALLY KNOW, AT FCC COLEMAN.  THE FACILITY DID NOT HAVE A

NOTARY PUBLIC AVAILABLE TO WITNESS MR. SCRIVER'S SIGNATURE.

HOWEVER, MR SCRIVER DID READ THE FOREGOING AFFIDAVIT AND THAT ALL

THE FACTS CONTAINED  THEREIN ARE TRUE AND CORRECT TO THE BEST OF

HIS KNOWLEDGE.

_____

EUGENE ZENOBI, ESQ.

State of Florida)
County of _____ )

    Before me, the undersigned authority, personally appeared EUGENE
ZENOBI who after being duly sworn deposes and says that the foregoing
Complaint has been read and the facts contained therein are true.

    SWORN TO AND SUBSCRIBED before me this ____ day of
_____, 2002

MARIA TERESA ORTEGA
COMMISSION # CC 723869
EXPIRES MAR 11, 2002
BONDED THRU
ATLANTIC BONDING CO., INC.

_____
NOTARY PUBLIC
State of Florida at Large

_X_ Personally Known
___ Produced identification -  Type of identification produced

# THOMAS O. BONNER, PH.D.

## MIAMI DIAGNOSTIC & PSYCHIATRIC CENTER

9480 S.W. 77th Avenue
Miami, FL 33156

Tel: (305) 595-1616
Fax: (305) 595-7272

| Diplomate in Clinical Psychology | | Fellow of the |
|---|---|---|
| American Board of | Clinical Psychology | Academy of |
| Professional Psychology | Neuropsychology | Clinical Psychology |

## PSYCHOLOGICAL EVALUATION

### CONFIDENTIAL: FOR PROFESSIONAL USE ONLY

| | |
|---|---|
| NAME: | Richard Scriver |
| DATE OF BIRTH: | December 26, 1953 (age 47) |
| DATE OF EXAMINATION: | December 29, 2001 |
| REFERRED BY: | Jeanne Baker, Esquire |

The patient is a forty-three year old divorced male whose education extended through high school. He was seen at the Federal Detention Center for this evaluation through the courtesy of his attorney, Jeanne Baker. Assessments were requested of his personality functioning, to include a psychodynamic description of any underlying psychopathology.

## SIGNIFICANT BACKGROUND

Much of the information contained in this section results from an interview with the patient, alone. Since the patient is well known to the referral source, no attempt will be made to provide an exhaustive history here.

In beginning to describe his troubles, the patient stated, "I had been happily married for twelve years. Everybody thought we were the perfect couple." He then described an incident where he discovered his wife locked in a passionate embrace with a business associate of his. He continued, "I confronted her, and she acknowledged that this man had made sexual overtures towards her." She moved out of their house a few days later, and began dating the other man. The patient and his wife subsequently met on several occasions, and then he said they talked about getting back together. Then, he recalled, "She dropped a bomb on me. She said she was dating somebody else (i.e., a different man than the one mentioned just above) and wanted an immediate divorce." At this point in his story, the patient begin to cry openly. "I started drinking every day after that. I felt my life was such a mess. I began to get depressed, and I started going out all the time. Everybody saw how much I changed. My neighbor, Merry Haber, told me that I looked terrible. She was the one who said, 'You look so depressed.' I guess I really was. I couldn't sleep, and I found it very difficult to work every day."

Exhibit "G"

Richard Scriver
December 29, 2000
Page 2

I also asked the patient about the financial difficulties he encountered after his divorce. He described the history of his business dealings and their relationship to his marital status over the past few years. He began by saying that he had experienced a major business failure in some retail clothing store in which he had invested in Atlanta, where he said, " I lost everything." Subsequently, he and his wife moved to Miami and became involved in brokering real estate transactions and managing the commercial real estate properties involved. He said,

> My wife was the sole owner of the interests in the commercial properties we managed. Any profits from this real estate business went directly to my wife . . . She was working for and HMO (at a good salary) . . . we were doing better financially (than they had before). When the breakup abruptly occurred, she left the condo (in which they resided)—she had two mortgages on the condo—and I didn't even have enough money for an apartment. I had actually been working *for* my wife—managing her interests in these properties. So I was instantly out of a job. I wouldn't have been able to pay rent the next month. I had no credit cards, no income, even the car was in her name. So as the divorce occurred, I went into a real bad depression.

He then described how a man named Everett Lynch got involved in his life by offering the patient a real estate management job, and by buying his wife's real estate interests, as well as the condo, and allowing him to live there until it could be sold as an investment property. He also provided the patient with a car. Thus, the patient felt extremely involved with, dependent on, and obliged to his benefactor and employer, Mr. Lynch. He stated,

> So this deal came along—of course now I know it wasn't real—but my commission could have been around $1,000,000. I had just been served with divorce papers two weeks earlier. So this deal was a godsend. It would have solved *all* my financial problems. I was ecstatic that it would have happened and given me a new start. I was still really grieving about my marriage and divorce, and my wife was saying that her new boyfriend was really jealous and didn't want her to contact me anymore; he also wanted her to have her name off of all the shared property loans attached to the various commercial properties in which we had invested and were managing. The deal with Everett and my (continued) employment with Everett was dependent on removing her from the loans—so by selling all the properties to this man from Atlanta there would be three benefits: Everett would make a good profit; I would make a good profit; and my wife would be off as guarantor of all the loans.

I then queried the patient about any symptoms of major depression he recalled experiencing just prior to the time of the offense. Of the nine possible criteria for this diagnostic category, he satisfied eight of them (where only five of nine are required to qualify for this diagnosis):

Richard Scriver
December 29, 2000
Page 3

1. **Depressed mood**—"I was really depressed after my wife's divorce request. It's the only thing I thought of day after day."

2. **Diminished interest and pleasure in life**—" I really grew detached from my responsibilities. I went from working at least eight hours a day to only about three hours a day, and those hours weren't productive."

3. **Weight change**— "I lost thirty-five pounds in about six months, because I had no appetite."

4. **Sleep problems**— "I would awaken in the middle of the night and just cry. I'd expect her to be there, and she wasn't."

5. **Fatigue**—"I felt tired all the time. I had no energy."

6. **Feelings of worthlessness or guilt**—" I felt like my life had been destroyed."

7. **Poor attention and concentration**—"I couldn't focus or concentrate on my work."

8. **Obsessive thoughts of death or suicide**—"The night she asked for the divorce, I had the guns out. I had a friend get rid of them. I still think about it several times a week."

**Other problems::** Aside from these just mentioned symptoms of Major Depressive Disorder, the patient denied symptoms of any other mental illness, including hallucinations, paranoid delusions, manic episodes, and a history of physical of sexual abuse. He did acknowledge regularly abusing alcohol following his wife's request for divorce, saying, "I had to go out. I couldn't stay home at night. And I drank every night. I only did ecstasy four times. I did no other drugs. I didn't really drink before then. And I never went to night clubs before, with my wife or otherwise.

## REPORTS OF OTHERS

Defense counsel provided me with information based on the testimony of several individuals well known to Mr. Scriver, which is summarized below:

**Erica Vass (former dating partner):** Ms. Vass stated that she noted a large change in the patient where she said he went from rather quiet and conservative to much more wild, almost like a teenager. She also stated she never saw him doing drugs.

**Constance Polevich (the patient's first wife):** Ms. Polevich indicated that the divorce was a complete surprise for the patient, and that he was shocked and devastated. She recalled that on one occasion, he indicated that he was thinking of suicide. She also noted that she never observed him using drugs.

Richard Scriver
December 29, 2000
Page 4

Arthur Barron (former business associate): Mr. Barron noted that prior to the divorce, the patient had been very focused on his business, while after the divorce, his focus was disturbed, he was socializing much more and not paying attention to his business, and he seemed depressed.

Merry Haber, Psy.D., (neighbor and forensic psychologist): Dr. Haber, a noted local forensic psychologist, said that she had been the patient's neighbor for the past eight years, and though she did not socialize with him, she saw him several times a week as they both came and went from their residences. After the separation from his wife, Dr. Haber noticed that he looked very sad, haggard, worried, and had lost weight. She said that she had formed a clinical opinion of his functioning in the early spring, thinking that he was quite depressed. She said she expected that he would soon recover, but noted that he did not, affirming her opinion that he was quite depressed.

## BEHAVIOR DURING EXAMINATION

The patient was alert and cooperative throughout the evaluation. He appeared to try to do his best on all tests administered. His mood was rather sad and hopeless. His style of emotional and affective expression ranged from dreary and reserved to more openly expressive. His speech was fluent and articulate. His language was substantive and grammatical. No abnormal movements were noted.

## TEST RESULTS

The only test administered to the patient was the Rorschach Inkblot Test, an unstructured, projective test of personality. It is the only test capable of offering information about the effects of stressors in the past versus the effects of those in the present, which is particularly germane to the current case. His pattern of responses indicated that he is currently suffering from the effects of a severe depression. There were numerous examples in his test responses of gloomy, morbid, and pessimistic themes and associations, all of which are reliable indicators of the presence of depression. It should be noted that the patient has never before been treated or evaluated by any other psychologist, and he is completely unaware of the theories underlying the Rorschach Inkblot Test, as well as the significance of any types of responses and associated clinical indicators.

In addition to the presence of depression, the patient's responses also indicated an extreme level of agitation, a sense of being overwhelmed by current and past stressors, and the sizeable presence of suicidal impulses and ideation. His pattern of responses to this test are indicative of the presence of a substantial degree of stress prior to the present time, which supports the assertion that he was experiencing a severe degree of depression long before his arrest, and that his depression preceded and significantly contributed to his decision to engage in the offense in question.

This position is strongly supported by the computer generated interpretation (Exner & Weiner/PAR Psychological Assessment Resources, 1999) of his test responses, as follows:

Richard Scriver
December 29, 2000
Page 5

This person appears to be in a state of chronic and substantial stimulus overload resulting from persistent difficulty in mustering adequate psychological resources to cope with the demands being imposed on him by internal and external events in his life. People with this pattern of stimulus overload tend to have limited tolerance for frustration and less than average ability to persevere in the face of obstacles; consequently they may show a tendency towards impulsive outbursts of unwarranted affect and/or *ill-advised actions*. The degree of his stimulus overload is likely to be preoccupying and disorganizing; even in fairly structured situations in which he knows what is expected of him, *he is at risk for becoming psychologically incapacitated*, at least temporarily, and appearing to others as noticeably agitated and distraught. . . *The specific sources of stress in his life appear to involve ongoing concerns and issues rather than merely situational or transient problems and worries*. . . He appears to be experiencing some intrusive ideation consisting of disconcerting and worrisome thoughts that serve no apparent purpose and are likely to be impairing his ability to concentrate. Some of his stress appears to stem from painful internalized affects that are likely to contribute to feelings of dysphoria. *One source of stress for him appears to involve feelings of loneliness and/or grief related to recent experiences of object loss (i.e., the loss of a loved one) or emotional deprivation* (all italics mine).

## DIAGNOSTIC IMPRESSION

Based on all the data gathered in this evaluation, the most appropriate formal DSM-IV diagnostic classification is judged to be:

| | | |
|---|---|---|
| Axis I: | 296.23 | Major Depressive Disorder, Single Episode, Severe. |
| Axis II: | | Deferred. |
| Axis III: | | No relevant medical conditions reported. |
| Axis IV: | | Stressors: Marital loss; work conflicts; financial distress; legal difficulties—severe. |
| Axis V: | | Current Global Assessment of Functioning: 50/100. |

## SUMMARY & CONCLUSIONS

Richard Scriver is a man who is currently severely depressed, and has been since the separation and divorce from his wife. This depression was made much worse by his difficult financial situation, and the helpless, dependent, and hopeless position in which he believed himself to be at the time this seemingly fortuitous financial opportunity came along. Both clinical observation and test data support this assertion. In addition, interview and test data, as well as the reports of others, give strong support to the presence of the same degree of depression (if not more) prior to the patient deciding to commit the offense in question.

Richard Scriver
December 29, 2000
Page 6

Therefore, it is my professional opinion, to a reasonable degree of psychological certainty, that the patient's experience of Major Depressive Disorder, Single Episode, Severe, at that time caused a significantly diminished capacity in his judgment, and contributed substantially to his decision to commit the offense in question.

I hope this information is helpful.  Please do not hesitate to contact me if I can be of any further assistance in this case.

Thomas O. Bonner, Ph.D.
Florida Licensed Psychologist No. PY2826